MICHAEL W. FOSTER (State Bar No. 127691)
MICHAEL E. WILBUR (State Bar No. 152361)
TAMMY A. BROWN (State Bar No. 172612)
**FOSTER EMPLOYMENT LAW**
3000 LAKESHORE AVENUE
OAKLAND, CALIFORNIA 94610
TELEPHONE: (510) 763-1900
FACSIMILE: (510) 763-5952

Attorneys for Defendant
ALAMEDA-CONTRA COSTA TRANSIT DISTRICT

UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

BRIAN GILMER, ANTHONY RODGERS, DELORIS WILKINS, JERRY WILLIAMS, RAYMOND ROBBINS

Plaintiffs,

vs.

ALAMEDA-CONTRA COSTA TRANSIT DISTRICT,

Defendant.

Case No. C08-05186CW (EDL)

Date Action Filed: Nov. 17, 2008
Trial Date: Not set.

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION TO DECERTIFY COLLECTIVE ACTION AND FOR SUMMARY ADJUDICATION**

Hearing: June 30, 2011
Time: 2:00 p.m.
Courtroom: 2 [1301 Clay St., Oakland]

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..... 2

II. FACTS ..... 5

A. Overview of Case and Proceedings ..... 5

1. Plaintiffs' Contentions & Definition Of The Class ..... 5

2. Proceedings ..... 7

a. Stipulation To Proceed As A Collective Action. ..... 7

b. Summary Judgment Order ..... 7

c. Plaintiffs' Damages Calculations And Liability Assumptions ..... 8

d. Defendant's Limited Discovery From Plaintiffs ..... 11

B. The Plaintiffs ..... 12

1. The Named Plaintiffs. ..... 12

a. Their Travel. ..... 13

b. They Have No Opinion As To How Much They Believe They Are Owed. ..... 14

c. They Believe The Class Is Similarly Situated Simply Because All Plaintiffs Have Been Bus Drivers Covered By The Same CBA. ..... 15

2. The Named Plaintiffs Have No Information About The Opt-Ins' Claims ..... 15

C. The Plaintiffs' Terms and Conditions of Employment and Pay Are Established By Collective Bargaining ..... 16

1. The 8-Hour Day Standard ..... 17

2. Premium Pay ..... 17

3. Travel Time ..... 17

4. The 2007-2008 Negotiations ..... 18

D. Plaintiffs' Damages Calculations ..... 20

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

1. Premium Payments Not Taken Into Account as Credits ....20

2. Regular Rate Improperly Calculated ....21

3. Non-Overtime Compensation Improperly Included ....21

4. No Accounting for De Minimis Claims ....21

E. The April 10, 2007 Settlement ....21

III. ARGUMENT ....22

A. This Case Should Be Decertified as a Collective Action. ....22

1. The Disparate Factual Settings Affecting The Issues That Remain To Be Decided On The Plaintiffs' Split-Shift Travel Time Claims Make This Case Not Appropriate To Be Continued As A Collective Action. ....23

a. The Named Plaintiffs Are Not Representative Of The Opt-In Plaintiffs And Have Not Acted As Representatives. ....24

b. Testimony Of 38 Drivers Establishes Multitudinous Experiences. ....25

c. Travel Patterns Vary Significantly From One Division To Another. ....27

2. Allowing This Case To Proceed As A Collective Action Will Deny The District A Meaningful Opportunity To Present Available Defenses To Each Plaintiff's Split-Shift Travel Time Claim. ....28

3. Fairness And Procedural Considerations Also Support An Order Decertifying This Case As A Collective Action. ....29

a. This Is Not A *Mt. Clemens Pottery* Factory Setting Case ....31

b. Given The Issues To Be Decided In Light Of This Court's Prior Order, The Case Is Simply Not Manageable As A Collective Action ....32

c. Because The Court And Defendant Were Not Involved In Drafting Notice To The Class, It Cannot Even Be Assumed That The Opt-In Plaintiffs Believe They Have Legitimate Travel Time Claims ....33

B. The District Acted In Good Faith And Did Not Willfully Violate The FLSA. ....34

1. The District's Position Is Supported By Substantial Legal Authority, Thus Establishing Its Objective Good Faith ....36

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

2. District Personnel Acted With Subjective Good Faith By Compensating Drivers In Accordance With The Terms Of The Collective Bargaining Agreement And By Relying On The Union's Representations That Modifications Agreed To In June 2008 Would Resolve All Issues Relating To The Compensation Of Drivers For Travel Time....38

C. With Respect To Each Plaintiff, The District Is Entitled To Credit All Premium Payments That Were Made To That Plaintiff For "Elapsed" Or "Spread" Time (As Well As Other Premium Payments) Against Any Amounts That Would Otherwise Be Owed Under The FLSA For Hours Worked Over 40 In A Workweek....39

1. In Addition To The Premiums That Have Already Been Incorporated Into The Plaintiffs' Expert's Report, The District Is Also Entitled To A Credit For The Premiums Paid When An Employee Works On A Scheduled Day Off....40

2. The District Is Entitled To A Credit For "Elapsed" Or "Spread" Time Premiums....40

3. The District Is Entitled To Credit *All* Applicable Premium Payments Made To Any Plaintiff Against Overtime Compensation That Would Otherwise Be Due To That Plaintiff, And Should Not Be Limited To Applying The Credit Only To Overtime Compensation Due For The Workweek In Which The Premium Was Paid....41

D. Premiums For Spread Time Or Elapsed Time Are Not Properly Includable In The Calculation Of The Regular Rate For The Purposes Of Determining The Amount Of Overtime, If Any, To Which Any Plaintiff May Be Entitled....42

E. Pursuant To The Terms Of The April 10, 2007, Settlement Agreement, The Plaintiffs Are Barred From Recovering For Any Amounts Allegedly Due For Travel Time For Any Period Prior To August 8, 2006....43

F. Plaintiffs Are Not Permitted To Recover For Their Gap Time....44

G. The District Is Entitled To Judgment As A Matter Of Law On All *De Minimis* Claims....44

IV. CONCLUSION....45

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

## TABLE OF AUTHORITIES

Page

**Cases**

*Abbey v. City of Jackson, 883 F.Supp. 181 (E.D. Mich. 1995)* .......... 41

*Alexander v. United States, 32 F.3d 1571 (Fed. Cir. 1994)* .......... 42

*Alvarez v. IBP, Inc., 339 F.3d 894 (9th Cir. 2003)* .......... 45

*Anderson v. Mt. Clemens Pottery, 328 U.S. 680, 66 S. Ct. 1187; 90 L. Ed. 1515 (1946)* .......... 30, 31, 45

*Baker v. Delta Air Lines, 6 F.3d 632 (9th Cir. 1993)* .......... 36

*Beauperthuy v. 24 Hour Fitness USA, Inc., 2011 U.S.Dist. LEXIS 24768, *14 (N.D. Cal. 2011)* .......... 30

*Brinkman v. Department of Corrections, 21 F.3d 370 (10th Cir. 1994)* .......... 36

*Brock v. Willamowsky*, 833 F.2d 11 (2d Cir. 1987) .......... 40

*California Correctional Peace Officers v. State of Cal.*, 189 Cal.App. 4th 849 (2010) .......... 17

*England v. New Century Fin. Corp.*, *370 F.Supp.2d 504 (M.D. La. 2005)* .......... 24

*Fox v. Tyson Foods, Inc., 519 F.3d 1298 (11th Cir. 2008)* .......... 33

*Frye v. Baptist Memorial Hosp*. *2010 U.S. Dist. LEXIS 101996 (W.D. Tenn. 2010)* .......... 24

*Gerlach v. Wells Fargo & Co., No. 05-0585, 2006 U.S. Dist. LEXIS 24823 at *5-6 (N.D. Cal. Mar. 28, 2006)* .......... 22

*Gilbert v. Citigroup, Inc., 2009 U.S. Dist. LEXIS 18981 at *10-11 (N.D. Cal. Feb. 18, 2009)* .......... 22, 33

*Herman v. Fabri-Centers of Am., Inc., 308 F.3d 580 (6th Cir. 2002)* .......... 42

*Hesseltine v. Goodyear Tire & Rubber Co., 391 F.Supp.2d 509 (E.D. Tex. 2005)* .......... 42

*Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001)* .......... 22, 33

*Hoffmann-La Rouche, Inc. v. Sperling 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1980)* .......... 24, 29

*Howard v. City of Springfield, 274 F.3d 1141 (7th Cir. 2001)* .......... 42

*Huss v. City of Huntington Beach, 317 F.Supp.2d 1151 (C.D. Cal. 2000)* .......... 36

*Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal.App.4th 729 (2009) .......... 17, 26, 27

*Kollheim v. Glynn County, 915 F.2d 1473 (11th Cir. 1990)* .......... 42

*Kress v. PricewaterhouseCoopers, LLP, 263 F.R.D. 623, No. 08-0965, 2009 U.S. Dist. LEXIS 117949, 2009 WL 4269465, at *3 (E.D. Cal. Nov. 25, 2009)* .......... 22

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

*Lawrence v. City of Philadelphia, 2004 U.S. Dist. LEXIS 8445 2004 WL 945139 (E.D. Pa. 2004)* .......... 23

*Leahy v. City of Chicago, 96 F.3d 228 (7th Cir. 1996)* .......... 37

*Leuthold v. Destination Am., Inc., 224 F.R.D. 462 (N.D. Cal. 2004)* .......... 22, 23, 33

*Lewis v. Wells Fargo & Co., 669 F.Supp.2d 1124 (N.D. Cal. 2009)* .......... 22

*Lindow v. U.S., 738 F.2d 1057 (9th Cir. 1984)* .......... 29, 44, 45

*Lusardi v. Lechner, 855 F.2d 1062 (3rd Cir. 1988)* .......... 32

*McElmurry v. U.S. Bank Nat. Assoc., 495 F.3d 1136 (9th Cir. 2007)* .......... 29

*McLaughlin v. Seto, 850 F.2d 586 (9th Cir. 1988)* .......... 30, 34

*Murillo v. P.G.&E.*, 2010 U.S. Dist. LEXIS 7 3427 (E.D. Cal. 2010) .......... 42

*O'Brien v. Ed Donnelly Enters., 575 F.3d 567 (6th Cir. 2009)* .......... 33

*Reed v. County of Orange, 266 F.R.D. 446 (C.D. Cal. 2010)* .......... passim

*Service Employees Int'l Union, Local 102 v. County of San Diego, 60 F.3d 1346 (9th Cir. 1994)* ... 36

*Singer v. City of Waco, 324 F.3d 813, 8288 (5th Cir. 2003), cert. denied, 540 U.S. 1177, 158 L. Ed. 2d 77, 124 S. Ct. 1410 (2004)* .......... 42

*Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095 (10th Cir. 2001)* .......... 22

*Trans World Airlines, Inc. v. Thurston 469 U.S. 111, 128, 83 L.Ed. 2d 523, 105 S.Ct. 613 (1985)* .......... 34

*United Transportation Union, Local 1745 v. City of Albuquerque* 178 F.3d 1109 (10th Cir. 1999) .......... 19, 36, 37

*Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935 (9th Cir. 2009)* .......... 24

**Statutes**

*29 U.S.C. § 207* .......... passim

*29 U.S.C. § 207(h)(1)* .......... 39

*29 U.S.C. § 216(b)* .......... 5, 22, 35

*29 U.S.C. § 260* .......... 35

*29 C.F.R. § 778.200* .......... 9

*29 C.F.R. § 778.204(b)* .......... 40

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

Pursuant to this Court's May 11, 2011, Order, PLEASE TAKE NOTICE THAT on June 30, 2011, at 2:00 pm, or as soon thereafter as the matter may be heard in Courtroom 2 of the above-entitled court, defendant Alameda-Contra Costa Transit District ("AC Transit" or the "the District") will and hereby does seek the following orders:

(1) **An Order Decertifying this Case as a Collective Action:** AC Transit seeks an order decertifying this case as a collective action because the plaintiffs are not "similarly situated" with respect to critical factual determinations that must be made on the split-shift travel time claim.

(2) **An Order Denying Plaintiffs' Motion for Partial Summary Judgment and Granting AC Transit's Cross-Motion For Summary Adjudication:** AC Transit seeks an order denying plaintiffs' motion for partial summary judgment and instead summarily adjudicating each of the following issues in favor of AC Transit:

a. The Court should find that the District did not willfully violate the FLSA by failing to count start-end travel time or split-shift travel time as "hours worked" for the purpose of calculating any overtime to which drivers may have been entitled, and the District also acted in good faith, because (i) the District's position is supported by substantial legal authority, and (ii) the District did not unilaterally decide how to compensate employees when they engaged in start-end or split-shift travel, nor did the District unilaterally decide not to count start-end travel time or split-shift travel time as hours worked, but instead these matters were the subject of collective bargaining negotiations and agreements between the District and the plaintiffs' union;

b. Pursuant to section 207(e) of the FLSA and section 778.200 *et seq.* of the regulations issued by the United States Department of Labor Wage and Hour Division, the Court should order that the District is entitled to credit all of the following premium payments that were made to each plaintiff against any amounts that would otherwise be owed to them for hours worked in excess of 40 hours in any workweek: (1) premiums paid when employees work more than 8 hours in a workday (§ 207(e)(5)); (2) the .15 premium paid since June 2008 when start-end travel time results in more than 40 hours per week or more than 8 hours in a day (§ 207(e)(5)); (3) the premium of 1.5 times an employee's regular pay, which is paid when an employee works on a holiday (§

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

207(e)(6) premium); (4) the premium of 1.5 times an employee's regular pay that is paid to an employee when he or she works on a regularly scheduled day off (§ 207(e)(6), and (5) the premium paid for elapsed, or "spread," time (§ 207(e)(7));

c. Pursuant to section 207(e) of the FLSA and section 778.200 *et seq*. of the regulations issued by the United States Department of Labor Wage and Hour Division, the Court should also rule that none of the premium payments identified above are includable in the calculation of the drivers' regular rate of pay;

d. The Court should rule that the District is entitled to credit on an aggregate basis *all* applicable premium payments made to any plaintiff against all overtime compensation otherwise due to that plaintiff, and the District should not be limited to applying credits only to the workweek in which the premium was paid;

e. The Court should rule that the plaintiffs in this action may only recover for unpaid overtime – not unpaid straight time.

f. Pursuant to the terms of an April 10, 2007 settlement agreement and the plaintiffs' Complaint , the Court should rule that the plaintiffs in this action are barred from recovering for any period prior to August 8, 2006; and

g. The Court should also rule that no plaintiff is permitted to recover for unpaid overtime in any workweek in which the amount of that plaintiff's claimed overtime is less than 10 minutes per day.

The District's Opposition and Cross-Motion are supported by the following Memorandum of Points and Authorities, the Declarations of Tammy Brown, William Coffel, and Jeffery Petersen served and filed herewith, all other pleadings and papers on file on this action, and all other matters that may be properly presented to the Court at or prior to the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

When the parties previously stipulated that this case could initially proceed as a collective action pursuant to 29 U.S.C. § 216 (b), AC Transit expressly preserved its right to later move to

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

decertify. AC Transit now seeks an order decertifying this case as a collective action because the plaintiffs are not "similarly situated" with respect to the critical factual determinations that must be made on their split-shift travel time claim.

The Court has ruled that the method of compensating employees for start-end and split-shift travel time under the collective bargaining agreement ("CBA") between the District and the plaintiffs' union is inconsistent with the FLSA. The Court has also ruled that start-end and split-shift travel time must be counted as "hours worked." The Court further ruled, with respect to the plaintiffs' split-shift travel time claims, that the District must include each plaintiff's "actual travel time," and not the amount imputed under the CBA. Thus, as to the split-shift travel time claim, this Court's prior order leaves for "the damages phase" of this action a determination of each plaintiff's "actual travel time," which is an inherently individualized issue, not susceptible to determination on a "class-wide" basis.

By plaintiffs' own estimate, the split-shift travel at issue in this case involves more than 230 travel point combinations with distances ranging from 100 yards to over 10 miles. The District has only been permitted to depose a small fraction of the 1,362 plaintiffs who purportedly filed consents to join this action, but even that small fraction's testimony reveals there are too many variables with regard to how and when they traveled to say that all 1,362 purported plaintiffs are "similarly situated." For example, the thirty-eight opt-in plaintiffs who were deposed testified that they had engaged in split-shift travel by a variety of methods, including riding the bus, riding in or driving a car, walking, riding BART, riding a District bus that was not in service to the public, or some combination of these methods. They also testified that they did not exclusively use one method or combination to travel between the same travel points. In other words, one day a driver might walk between points A and B, and the next day the same driver might receive a ride in someone's car, etc. All of these variables mean that proceeding as a collective action to determine each plaintiff's own actual split-shift travel time is both unmanageable and unfair.

Plaintiffs have attempted to create the impression that the case is manageable as a collective action by suggesting that liability and damages can be established without using any evidence from

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

the plaintiffs themselves. To calculate their claimed damages, plaintiffs have transferred the District's payroll records into a massive excel spreadsheet, and where the spreadsheet indicates that a driver engaged in split-shift travel, the plaintiffs have simply inserted an assumed amount of time based on current data from the website www.511.org. However, the plaintiffs' use of the 511.org data is fundamentally flawed. That data only reflects the amount of time it currently takes (in 2011) to travel between specified points on AC Transit buses or, in certain circumstances, on a combination of AC Transit buses and BART. The data provides no estimate of the "actual travel time" for someone who travelled by car, by walking, or by any of the various combinations of travel methods actually used by the plaintiffs in this case over the last several years.

The limited discovery the District was permitted to obtain in this case shows that (1) the drivers had unique, not representative, experiences with regard to their travel, and (2) the assumptions made by the plaintiffs in an attempt to make the case manageable on a class-wide basis simply are not representative of what actually occurred. As a result, allowing plaintiffs to continue to pursue this action as a collective action will severely prejudice the District. Therefore, the Court should decertify the collective action.

In addition, the Court should rule that this action is governed by a two-year statute of limitations and plaintiffs are not entitled to liquidated damages. Even though the Court has already ruled against the District on the issue of whether start-end and split-shift travel must be counted as "hours worked," the District submits that the parties' extensive briefing of the issues demonstrates that the District's position was supported by substantial authority. For that reason alone, the Court should find as a matter of law that the District did not willfully violate the FLSA. Moreover, given the fact that the District negotiated with the plaintiffs' union about the issue of travel time only months before this lawsuit was filed, and the District's former General Manager, Rick Fernandez, has testified that he believed (based on the union's representations) that the 2008 agreement to modify the CBA resolved the FLSA issues relating to travel time, the District also respectfully submits that the undisputed evidence shows that its actions were in good faith and that the District had reasonable grounds for believing that it was not in violation of the FLSA.

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

Finally, the District also requests that the Court summarily adjudicate a number of legal issues relating to the proper manner of calculating damages. First and foremost, the Court should rule that the District is entitled to a credit, pursuant to section 7 of the FLSA, for premiums paid to drivers for "elapsed" or "spread time" under the CBA, and that the District is entitled to all other credits available under section 7(e) of the FLSA. Second, the Court should rule as matter of law, and pursuant to the weight of authority on the issue, that all applicable credits should be given to the District on a cumulative (or aggregate) basis, as opposed to being limited to the specific workweek in which the premium was paid. Third, spread time payments (and other creditable premiums) should not be included in the calculation of the regular rate. Fourth, no plaintiff should be permitted to recover for the period prior to August 8, 2006. Fifth, no plaintiff should be permitted to recover for allegedly unpaid or underpaid straight time. Lastly, no plaintiff should be permitted to recover for any week in which the amount of overtime allegedly due is *de minimis*.

## II. FACTS

### A. Overview of Case And Proceedings

#### 1. Plaintiffs' Contentions & Definition Of The Class

This case was filed as a collective action pursuant to 29 U.S.C. § 216(b). Named plaintiffs claim the class consists of 1,362[1] current and former AC Transit bus drivers who are allegedly "similarly situated" because they perform "substantially similar duties for AC Transit District and are uniformly subject to and are currently being subjected to AC Transit District's uniform, class-wide payroll practices, including the District's policy and practice" with respect to the manner of compensating for "start-end" travel and "split-shift" travel. ***Ex.46*** *(Complaint ¶ 27 [docket #1]) to the Declaration of Tammy A. Brown filed herewith*[2].

"Start-end travel time" occurs when a driver's workday ends at a point different from the

---

[1] Defendant has received consents for 1,361 plaintiffs, not 1,362. And one of those 1,361 consents was filed "by" a deceased former driver, Vernia James, after her death. *Exhibits 38-39 to Declaration of Tammy A. Brown filed herewith at ¶¶39-40*. Defendant knows, of course, that the consent filed by the deceased plaintiff is fraudulent, but Defendant has no way of knowing whether all of the other consents truly represent the wishes of the plaintiffs whose names appear on those documents.

[2] Unless otherwise noted, all exhibits which cited herein are exhibits to the Brown Dec. and will be bolded.

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

geographic point where the workday began. The theoretical amount of time it takes for a driver to travel from the ending point back to the starting point is "start-end travel time." See *1-15-10 Order on Cross-Motions for Summary Judgment [docket # 98], attached as Ex. OO to Decl. of Philip Monrad filed 5-19-11 ISO Pltfs.' Mo. For Partial Summary Adj.*[3]

"Split-shift travel time," by contrast, occurs when a driver's daily assignment includes two parts (a "split run"), where the two parts are separated by a period greater than one hour, and where the end point of the first part is different from the beginning point of the second. The time spent travelling from the end point of part one to the beginning point of part two of the run is "split-shift travel time." See *1-15-10 Order*. These starting and ending points are referred to as Location On/Location Off (LocOn/LocOff) points. The distance between the LocOn/LocOff points varies from 100 yards (where a driver's shift ends across the street from where it started) to over 10 miles (where a driver's shift ended in Fremont, but began in Hayward). ***Ex.*** *43 [Regan Ex. 9] & ¶45 to Brown Dec*. Over the course of the period from November 17, 2005 to the present, there have been more the 230 LocOn/LocOff combinations in split runs that are separated by more than 1 hour. *Id.* As a result, in light of this Court's prior order on the parties' cross-motions for summary judgment, final adjudication of the split-shift travel time claims in this case necessarily will require a determination of the actual amount of travel involved in travelling over more 230 different routes if a 3-year statute of limitations is applied.

At issue is the District's four "divisions" where it maintains bus yards. The Divisions are numbered 2, 3, 4, and 6, and are referred to, respectively as D2, D3, D4, and D6. D2's yard is in Emeryville. Its geographic area is primarily Emeryville, Berkeley, and most of Oakland. D3 is in Richmond. It serves cities in western Contra Costa County and northern Alameda County. D4 is

---

[3] This amount is "theoretical" because drivers are paid for start-end travel based on "scheduled running time," *regardless* of whether they *actually* engage in the travel. ***Ex. 52*** *(Declaration of Nancy Skowbo filed October 15, 2009 [Docket # 85]) at ¶ 20.* Drivers thus receive compensation for "start-end" travel based on the *assumption* that they use public transit to return to the starting point of a relevant run. *Id. at ¶ 21.* A driver who takes public transit to her starting point, and who returns *directly home* on public transit from her ending point, receives the same travel pay as a driver who commutes to work by car, and who returns to her starting point by public transit in order to commute home by car. *Id. at ¶¶ 21, 22.*

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

located in East Oakland, with routes primarily in the southern end of Oakland and San Leandro. D6's yard is located in Hayward. It services the area from Hayward through Fremont at the south most end of the county. *See Declaration of William Coffel filed herewith, ¶2.*

The amount of travel time varies by division. For example, drivers working in D2 were more likely to walk and drivers in D6 were more likely to use BART. *Brown Dec. ¶47.* Indeed, the expert that plaintiffs have hired to calculate their alleged damages testified that, "the average [travel time] by division is different because the patterns of travel are different within the division." ***Ex. 25*** *(Regan Dep.), pp. 103:2-21.*

**2. Proceedings**

**a. Stipulation To Proceed As A Collective Action**

The parties stipulated that the case could proceed as a "conditionally certified" class, with the District specifically reserving its right to challenge the class at a later time. *See **Ex. 48** (Stipulation filed April 1, 2009 [docket # 36]).* Because plaintiffs did not move for an order approving notice to the class, the content of the notice sent to the potential plaintiffs in this matter is unknown. Without this information, no one can ascertain the basis upon which those who actually signed the consents believe they are "similarly situated" to the named plaintiffs. Moreover, since one of the consents is unquestionably fraudulent in that it purports to have been filed on behalf of Vernia James, but was filed after her death, it is not even clear that all of the more than 1,360 people whose names appear on the consents have actually consented to be a part of this action. Another purported plaintiff, William Stanley, did not file a consent despite plaintiffs' claiming damages on his behalf. ***Ex. 47*** *(Notice of Additional Consents [docket #16]) & **Ex. 40** (email) & Brown Dec. ¶¶51 & 41.*

**b. Summary Judgment Order**

In January 2010, this Court issued an order on the parties' cross-motions for summary judgment. In that order, the Court ruled that the CBA's provisions providing that start-end and split-shift travel time are not counted as "hours worked" is inconsistent with the FLSA. *1-15-10 Order, Ex. OO to Monrad 5-21-11 Dec.*

The Court ruled that determining the amount of travel time to be counted as "hours worked"

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

under the FLSA depends on whether it is start-end or split shift travel time. Per the ruling, the amount of start-end travel time that is be counted as "hours worked" is the amount set by the CBA, i.e. the "scheduled running time" of the buses. *1-15-10 Order, p. 14:13-21.* This method of calculating "hours worked" for drivers whose workday starts and ends at different points is to be used, according to the Court's order, regardless of whether a given driver actually travels by bus and regardless of whether a particular driver actually engages in such travel at all.

The amount of split-shift travel time to be counted as "hours worked," by contrast, is the *actual time* it took a plaintiff to engage in such travel. *1-15-10 Order, p. 16:1-5.* Therefore, with respect to split-shift travel time, as contrasted with start-end travel time, whether a driver actually engaged in such travel is unquestionably relevant.

**c. Plaintiffs' Damages Calculations And Liability Assumptions**

The Court's order stated that, "determining the exact amount of travel time is an issue for the damages phase of this action." *1-15-10 Order, p. 9:6-7.* Plaintiffs have taken this to mean that they have already established liability and all that remains to be done in their case is to determine the amount of their damages. And plaintiffs further contend that establishing damages is simply a matter of taking the District's payroll records and modifying the amount of split-shift travel time that drivers were paid to equal the amounts estimated on the 511.org website.[4]

However, contrary to plaintiffs' assertions, the Court's January 15, 2010, order does not actually establish liability as to any plaintiff. Instead, even after this Court's order, to determine whether the District actually violated the FLSA as to any plaintiff, a plaintiff must establish that his "hours worked" (when recalculated in a manner consistent with the Court's order) actually exceeded 40 in a workweek during which that plaintiff was not compensated for all hours over 40 at a rate not less than one and one-half his regular rate of pay. *29 U.S.C. § 207.* If a particular plaintiff did not work over 40 hours, even when that person's actual amount of travel time is taken into account,

[4] In their motion for a protective order, plaintiffs described www.511.org as, "the Metropolitan Transportation Commission's ("MTC") web-based 'trip planner' service on its 511.org website, which service provides to the public the amount of time it takes to travel between distinct locations at particular times of the day." ***Ex. 54*** *(Dec. of Philip Monrad ISO Plts.' Mo. For a Protective Order [docket # 139]),* ¶22 filed 12-15-10.

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

there is simply no liability as to that plaintiff. Likewise, if, after taking into account actual travel time, it is shown that a driver worked more than 40 hours in one week, but was fully compensated through applicable premiums which are properly creditable against the overtime obligation under 29 C.F.R. § 778.200, *et seq.*, there also is no liability.

Therefore, the Court's summary judgment order did not establish liability as a matter of law. Instead, it adjudicated *how* liability can be established. And since the Court has ruled that each plaintiffs' actual amount of split-shift travel time must be counted as "hours worked," attempting to make such a determination on a "class-wide" basis is neither judicially efficient nor inherently fair to either side given the variety of individual factors that are involved in determining the actual amount of split-shift travel time for each plaintiff.

The District has no records regarding either how the drivers accomplished such travel or how long such travel took. This is because the CBA provided that travel time was not "hours worked" and the CBA neither required nor permitted the District to monitor drivers' actual travel time. This practice was consistent with the District's position that the drivers are exempt from the FLSA due to the MCA exemption. The District does, however, have documents indicating a driver's *scheduled* LocOn/LocOff points on a particular day and the time the driver was expected to be at a LocOn/LocOff point.

The District also has payroll documents indicating the various components of pay a driver received. However, given the manner in which drivers are compensated under the CBA (according to the time "scheduled" for various tasks, as opposed to the actual amount of time spent performing any particular task), the "hours" reflected on a driver's pay stub do not necessarily reflect the driver's true "hours worked." For example, when a driver works for the District but does not operate a bus, he is often paid for hours for which he would have paid had he driven, rather than the hours he actually worked. In such situations, the driver is usually paid for more hours than he actually worked. ***Ex. 9*** *(B. Gilmer) pp. 48:22-49:25 & 51:14-53:24 &* ***Ex. 50*** *(Declaration of David J. Cardiff ("Cardiff Dec.") filed October 15, 2009 [docket #80] at Exs. Q and R, §§59, 60, & 61).*

Named plaintiff Brian Gilmer is an example of this. On November 17, 2005, Gilmer was

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

assigned to a split shift. Instead of driving a bus, he performed "Committee" work for less than 8 hours. ***Ex. 9*** *(B. Gilmer) pp. 37:19-38:12 & 51:14-52:20.* The run he was assigned paid platform time (which is the time spent actually operating the bus); it also paid an "elapsed time" premium because the run in question ended over 12 hours after his first run began; and it also paid a premium for Gilmer's working on his day off. *Id. pp. 51:14-53:24.* Thus, he was paid for the equivalent of 17.43 hours of work on November 17, which is what the payroll data shows his having "worked." *Id.; see also* ***Ex. 26*** *(R. Robbins) pp. 54:18-56:12 & 56:22-24.*

Plaintiffs' proposed method of calculating "individual damages" originally credited Gilmer with more than 17 "hours worked" on November 17[5]. Then, after recognizing that Gilmer did not actually work anywhere close to 17.43 hours on November 17, 2005, plaintiffs told their expert to just "assume" that on days when employees were paid such "guaranteed" time, they actually worked no more than 7 hours for certain work and no more than 8 hours for other work. *See the 2nd Supplemental Report of Plaintiffs' Expert D. Paul Regan, which is attached as Ex. 2 to the Declaration of David Breshears filed in support of plaintiffs' motion, at ¶6 of pages ii of iv.* However, the revised assumption is still not necessarily representative of what actually occurred for any particular driver as drivers may have worked less or more hours. *See, e.g.,* ***Ex. 9*** *(B. Gilmer) pp. 48:22-49:25 & 51:14-53:24.*

The Court's January 15, 2010 Order holds that each plaintiff's actual split-shift travel time must be determined, but plaintiffs have made clear that they have no intention of trying to prove the actual travel time that any particular plaintiff ever engaged in on any specific occasion. Instead, plaintiffs intend to ask the trier of fact to assume that the "travel time" data on 511.org is sufficient proof of all plaintiffs' actual travel time. Plaintiffs base their liability/damages calculations on the erroneous assumption that all of their experiences are the same. To suggest that 511.org data is an adequate measure of their actual travel time, plaintiffs are necessarily asking the trier of fact to assume that all plaintiffs traveled by bus only or bus and BART, and that the time and route of such

---

[5] Jeffrey Petersen, who has extensive knowledge of economics and the use of Microsoft Excel spreadsheets, thought this was one of the largest and most complicated spreadsheets he had seen. *Decl. of Jeffrey Petersen, ¶3-4.*

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

public transportation is adequately reflected on current 511.org data. *Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) ¶¶37-38.* However, there is ample evidence that not all drivers rode the bus for their split-shift travel and it was not uncommon for drivers to engage in split-shift travel which was faster than taking public transportation. *See, Section B.1., a. below.* While defendant was permitted to depose only a small fraction of the plaintiffs, the testimony of those plaintiffs reveals that the assumptions underlying plaintiffs' damages calculations simply are not a reasonable reflection of what really occurred.

Moreover, plaintiffs' assumptions make no effort to account for the fact that the running times in 2011 (upon which they base all of their calculation) may differ dramatically from running times in 2005, 2006, 2007, 2008, 2009, and 2010. ***Ex. 25** (Regan Dep.) pp. 40:11-41:2.* Since there has been a reduction in bus platform hours of over 14% since 2008, it stands to reason that the bus rides have gotten longer in some situations either because the bus does not run as often or because a route was cancelled and made up with another route. *Coffel Dec. ¶3.*

**d. Defendant's Limited Discovery From Plaintiffs**

Since each class member's "actual" split-shift travel time is at issue, and since that information has not been tracked by the District, defendant initially sought discovery from the named plaintiffs as to each opt-in plaintiff's claimed "actual" travel time. This was done by both deposition questions and interrogatories. However, this yielded no information. For example, named plaintiff Deloris Wilkins testified that she had not made any attempts to determine the travel times for any of the other plaintiffs, and she had not even reviewed "her" responses to interrogatories regarding this same issue months after the responses had been served on her behalf. ***Ex. 32** (D. Wilkins) pp. 204:18-205:24.*

The District thereafter propounded discovery directly to the plaintiffs who were not named in the complaint (the "opt-in plaintiffs"). However, plaintiffs moved for a protective order to prevent the class members from being required to respond. *See, docket #s. 138-140.* At the same time, defendant moved to compel the named plaintiffs to respond to discovery regarding the class's damages relating to split-shift travel. Both motions were heard on January 11, 2011, by Magistrate

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

LaPorte. Based on the assumption that this was properly a collective action and therefore the discovery of the opt-in plaintiffs should be limited, the Court permitted the District to take no more than 50 depositions of the opt-in plaintiffs, with each deposition being no more than two hours in length, and limited to the subject of split-shift travel. *Docket # 169, p. 2:11-13 attached as Ex. SS to Monrad 5-19-11 Dec.* The Court further ordered counsel to meet and confer after 10 depositions, and those "meet and confer" efforts ultimately resulted in the District's deposing only 38 opt-in plaintiffs. *Brown Dec. ¶42.*

While limited, the deposition testimony was nonetheless revelatory. Simply put, it established that the class members are not similarly situated. *See §III. A. below.* Moreover, it proved the fallacy of plaintiffs' contentions that (1) the opt-in plaintiffs' damages "can ***only*** be calculated from the District's own records, supplemented as necessary by the 511.org 'trip planner' service ..." (***Ex. 55*** *(Pltfs.' Oppo. to Mo. To Compel [docket # 144] p. 1:15-18)*) and (2) "With the exception of providing their badge number, individual opt-ins will be unable to answer the District's questions without the involved assistance from legal counsel and plaintiffs' damages expert." ***Ex. 53*** *(Pltfs. Mo. For Protective Or. [docket # 138]) p. 20:7-9*). The deponents' testimony provided significant information regarding their split-shift travel, without the aid of 511.org or their counsel. And despite the fact that defendant was permitted only limited discovery as to the claims of individual plaintiffs, plaintiffs intend to proceed by proving damages on an individual basis.

**B. The Plaintiffs**

**1. The Named Plaintiffs**

**Brian Gilmer** has worked at only one division (D4, East Oakland) for his entire 30 year career with the District. ***Ex. 9*** *(B. Gilmer) pp. 17:8-16 & 23:20-24:6.*

**Raymond Robbins** has been a shop steward since January 2006. As a result, he has not operated a bus for more than 40 hours in any week since January 2006. ***Ex. 26*** *(R. Robbins) 27:9-28:7 & 134:5-8.* Robbins averages just over 20 hours per week driving a bus; because of various premiums and guaranteed payments under the CBA, he is paid the equivalent of more than 50 hours at his straight-time rate. Plaintiffs' expert has concluded that Robbins is only entitled to $15.92 in

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

unpaid overtime, for a single workweek in December, 2005. *Declaration of Jeffrey Petersen, ¶5, filed herewith.*

**Anthony Rodgers** has only worked out of D2. ***Ex.*** *27 (A. Rodgers) pp. 23:18-25 & 24:4-10.*

**Jerry Williams,** who is retired, last operated a bus for AC Transit before Thanksgiving 2008. ***Ex. 33*** *(J. Williams) pp. 20:10-19 & 22:5-8.* He worked only in Division 2. *Id. at 43:22-44:15.* Further, Williams had no start-end travel during the class period. *Id. at 58:1-7 & 205:9-18.*

**Deloris Wilkins'** home division is 3 (Richmond), except for a year when she was at D4 (East Oakland). ***Ex. 32*** *(D. Wilkins) pp. 16:16-20 & 58:5.* From November 2005 through December 2010, at least half of the time Wilkins worked for the District she did not drive a bus. *Id. at pp. 163:8-164:10 & 165:10-20.*

**a. Their Travel**

In December 2010, Gilmer testified about his mode of travel for his then-current run. The first shift of his run ended at Coliseum BART. His second shift began at D4, a distance of about ¾ of a mile. ***Ex. 9*** *(B. Gilmer) 191:2-14 & Brown Dec. ¶48.* For the first three weeks of that run, Gilmer testified that half of the time he would leave his car at the Coliseum BART station, so that he could drive back to D4 in about 5 minutes. *Id. at* ***Ex. 9*** *pp. 193:6-13, 194:2-13, 195:21-196:1, & 197:15-25.* The other half of the time, he rode the bus back. However, every day for one week of that run, Gilmer received a ride back to D4 from another driver who was also being relieved at the BART station. *Id. at 194:8-195:9.* (In other words, two drivers were travelling in the same car.) Therefore, over 50% of Gilmer's split-shift travel in that one month period was *not* done by public transportation. Gilmer testified that using the car took about him 5 minutes to return to D2. *Id. at 195:21-25 & 197:22-25.* Nonetheless, his expert has opined that Gilmer should be compensated for 19 minutes of split-shift travel time for travel between those two points. *Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Ex. 9A, p. 1.*

Rodgers accomplished his split-shift travel via car, bus, and deadhead. ***Ex. 27*** *(A. Rodgers) pp. 77:23-78:12, 80:13-24, 83:5-11, & 155:25-156:22.* (A deadhead bus is one that is driving on public roads but does not stop for passengers; for instance, if a bus is being moved to a different

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

point to start a run or a mechanic is test driving a bus.) Rodgers never received BART tickets from the District.[6] *Id. at pp. 91:12-19.*

Robbins has no damages if a two year statute of limitations is applied. ***Ex. 26*** *(R. Robbins) pp. 27:1-2 & Ex. 2B of Regan's 2nd Supp. at p. 15 of 36 (attached as ex. 2 to Breshears Dec.).* Robbins claims he is owed $15.92 in unpaid wages based on alleged overtime worked in a single workweek in December, 2005. *Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at p. 17 of 37 of Ex.2A; see also Peterson Dec., ¶5.* However, plaintiffs' recovery is limited to the period after August 7, 2006, based on the prior settlement agreement discussed below.

Wilkins had very little split-shift and start-end travel. ***Ex. 32*** *(D. Wilkins) pp. 228:4-8.* Like the other plaintiffs who were deposed, Wilkins' travel time varied. For instance, on one run, the driver who was relieving Wilkins would drive his car to the point where he was relieving her and she would then drive her co-worker's car back to the bus yard. *Id. at pp. 197:4-25.*

As with the other drivers, Williams' split-shift travel experiences varied. ***Ex. 33*** *(J. Williams) pp. 97:2-19, 99:10-23, 100:2-4, & 135:2-22.* For travel between the intersection of 45th at San Pablo Ave., Emeryville and the D2 yard, he always walked because no bus was available; walking took him about 7-8 minutes.[7] He rode on a deadhead bus, as did other drivers. *Id. at pp. 89:23-91:12, 92:1-3, 92:13, & 92:16-17.* He would also drive another driver's car or his wife would pick him up. *Id. at pp. 135:2-22.*

#### b. They Have No Opinion As To How Much They Believe They Are Owed

Not one of the named plaintiffs had an estimate as to what they were claiming as damages. ***Ex. 42*** *(Gilmer's Amend. Resp to Rogs- 2nd Set);* ***Ex. 27*** *(A. Rodgers) pp. 141:16-142:2, 190:6-15);*

---

[6] As of November 17, 2005, and through 2009, AC Transit had a practice of providing BART tickets to operators who had runs in Division 6 if a BART station was part of the operator's run. This practice was developed because, generally, the frequency of BART trains in Division 6 was faster than the District's bus lines, thus enabling the operator to spend less time in transit. Beginning in 2006, this practice was expanded to include one route in Division 4.

[7] Plaintiffs' expert, however, claims that there *was* a bus available. Regan's weighted average approach would pay Williams 12.67 minutes for this travel. ***Exs. 44 & 45*** *& ¶¶ 49-50 of Brown Dec.; Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Ex. 9A line 90.* However, the print out from 511.org Mr. Regan used shows the walking time as 8 minutes and the bus plus walking as taking 10 minutes. ***Exs. 44 & 45*** *to Brown Dec. & ¶49-50.*

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

*Ex. 32 (D. Wilkins) pp. 231:3-10; Ex. 33 (J. Williams) pp. 204:14-205:8, 201:11-20 & 203:2-8.* Robbins admits he does not how much he is owed, nor does he have an estimate, however, he wants to be paid ***if*** he is owed something. ***Ex. 26*** *(R. Robbins) pp. 111:12-20 & 111:25-112:14.* Rodgers testified what he wanted was "whatever the law provides for me to have in this circumstance," but that, "I'm not sure what that is because I'm not sure what the law provides." ***Ex. 27*** *(A. Rodgers) pp. 134:18-23.*

**c. They Believe The Class Is Similarly Situated Simply Because All Plaintiffs Have Been Bus Drivers Covered By The Same CBA.**

The named plaintiffs thought they were similarly situated to the rest of the class, because they all drove buses pursuant to the same CBA. ***Ex. 9*** *(B. Gilmer ) pp. 186-187;* ***Ex. 26*** *(R. Robbins) pp. 157:13-18, 157:21-158:7, & 158:14-17;* ***Ex. 27*** *(A. Rodgers) pp. 188:14-15, 188:18-22, 189:9-12, & 189:14-17;* ***Ex. 32*** *(D. Wilkins) pp. 229:25-230:2, 230:9-13 & 230:15-231:2 ;* ***Ex. 33*** *(J. Williams) pp. 211:13-14 & 211:17-212:8.* The other named plaintiffs believe the class is similarly situated because all of the members are bus drivers. ***Ex. 27*** *(A. Rodgers) pp. 188:14-15, 188:18-22, 189:9-12, & 189:14-17; see also,* ***Ex. 26*** *(R. Robbins) pp. 157:13-18, 157:21-158:7, & 158:14-17;* ***Ex. 33*** *(J. Williams) pp. 211:13-14 & 211:17-212:8.*

**2. The Named Plaintiffs Have No Information About The Opt-Ins' Claims**

The named plaintiffs know nothing about the opt-ins plaintiffs' claims. ***Ex. 9*** *(B. Gilmer) pp. 266:267;* ***Ex. 26*** *(R. Robbins) pp.147:16-148:11; 153:10-154:1 & 157:7, 156:2-3;* ***Ex. 27*** *(A. Rodgers) pp. 141:16-142:2, 190:6-15;* ***Ex. 32*** *(D. Wilkins) pp. 206:9-18, 207:19-21 & 207:23, & 208:2-5;* ***Ex. 33*** *(J. Williams) pp. 207:17-19 & 207:22, 207:24-208:1 & 208:3-9.* Nor have they made any efforts to investigate those claims. ***Ex. 9*** *(B. Gilmer) pp. 274-275;* ***Ex. 26*** *(R. Robbins) pp. 147:16-148:11; 153:10-154:1 & 157:7, 156:2-3;* ***Ex. 27*** *(A. Rodgers) pp. 193:8-18 & 193:24-25; 194:3-9, 194:22-25, & 195:19-199:19;* ***Ex. 32*** *(D. Wilkins) pp. 208:2-5 & 209:1-12;* ***Ex. 33*** *(J. Williams) pp. 204:18-205:8.* The depositions, as shown below, established that the opt-ins are a very diverse group in terms of split-shift travel. The opt-ins whose depositions were noticed but did not go forward also provide evidence of how dissimilar the class is. For example, opt-in plaintiff

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

Vernia James could not be deposed because she had passed away *prior to the filing of the lawsuit. **Ex. 38*** [8]. Opt-in plaintiff Robert Pacca did not want to be deposed as he would have had to do it on without being paid or by using his vacation time. *Brown Dec. ¶43 & **Ex. 41***. Some opt-ins could not even be located by plaintiffs' counsel. *Id.*

**C. The Plaintiffs' Terms and Conditions of Employment and Pay Are Established By Collective Bargaining**

All of the plaintiffs in this case are represented by the Amalgamated Transit Union, Local 192 ("ATU"), and at all times pertinent to this action, counsel for the plaintiffs has also been counsel to ATU. ***Ex. 49** (Declaration of Philip Monrad ("Monrad 10-1-09 Dec.") filed October 1, 2009 [docket #71]) ¶ 15.* Also, at all times pertinent, the plaintiffs' terms of employment and pay have been set out in a CBA between ATU and the District. *See **Ex. 50** (Cardiff Dec. at Exs. Q & R).*

Under the terms of the CBA, drivers (whom the District regards as exempt from the requirements of the FLSA because of the MCA exemption)[9], do not submit time cards or punch time clocks. ***Ex. 52** (Declaration of Nancy Skowbo ("Skowbo Dec.") filed October 15, 2009 [docket # 85]), ¶ 8.*. They also are not required to report to management before beginning or ending their daily driving assignments, nor during breaks between assignments. *Id.* AC Transit does not dictate how drivers spend their time between shifts or how they travel between the ending point of the first part of a run and the starting point of the second part. *Id.*, ¶ 24.

Under the CBA, the drivers are paid based on *scheduled* times for various activities associated with their daily assignments or "runs." *Id.*, ¶ 9. The categories of pay elements include "Platform," "Report," "Turn-In," "Elapsed," "Allowed," and "Travel," among others. *Id.*; *see also Stipulations, attached as Exhibit AA to Declaration of Philip Monrad In Support of Pltfs' Mo. For Sum. Judmt*. The CBA defines some, but not all of these pay elements as "hours worked." For example, "Report Time," "Turn-in Time," "Accident Report Time," and "Platform" time are all now defined as hours worked. ***Ex. 50** (Cardiff Dec. at Exs. Q & R).* "Travel Time" is not defined as "hours worked" under the CBA. ***Ex. 50** (Cardiff Dec. at Ex. R).*

---

[8] Someone signed a consent "on behalf" of Vernia James. ***Ex. 39** (docket #37.)*

[9] *See* the District's Cross-Motion for Summary Judgment filed October 15, 2009.

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

**1. The 8-Hour Day Standard**

The CBA establishes an 8-hour workday as the standard for the drivers. Under section 59 of the CBA, drivers are actually guaranteed 8 hours of pay each workday. ***Ex. 50*** *(Cardiff Dec. at Ex. Q §§ 59.02 & 59.03)*. As a result, if the sum of a driver's pay elements on a given workday is less than the equivalent of 8 hours, the balance of the amount necessary to ensure that the driver is paid for 8 hours is paid as "Guarantee" pay. *See Stipulations, Ex. AA to Monrad Dec.*

**2. Premium Pay**

In addition to guaranteeing 8 hours of pay, the CBA also provides that any driver who works more than 8 hours in a workday is paid time and one-half for all hours worked over 8. ***Ex. 50*** *(Cardiff Dec. at Ex. Q § 60.01)*. This daily overtime premium is purely a matter of contract, as it is not required by the FLSA or California law.[10]

In addition, the CBA also provides that drivers receive premium pay in all of the following circumstances: (1) a premium of 1.5 times an employee's regular pay is paid on top of the employee's straight time earnings when an employee works on a holiday; (2) a premium of 1.5 times an employee's regular pay is paid to an employee when he or she works on a regularly scheduled day off ; (3) a premium for "elapsed time," also called "spread time," is paid (regardless of the total number of hours worked by the driver in a given workday) whenever a driver's workday ends more than 10 hours after the driver first performed any work in the same workday; and (4) the 15% premium for travel time discussed below. *See Stipulations, Ex. AA to Monrad 5-19-11 Dec.*

**3. Travel Time**

The District's treatment of drivers' start-end and split-shift travel time has, at all pertinent times, been a matter addressed in the CBA. Section 54.01 of the CBA defines start-end time as resulting from drivers "reporting for duty or checking in at the home terminal or at some other place differing from the relief point by reasons of the District's requirement to do so." ***Ex. 50*** *(Cardiff Dec. at Exs. Q & R § 54.01)*. If drivers' shifts end at a different locations than where they began,

---

[10] California's daily overtime requirements do not apply to public entities. *Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal.App.4th 729 (2009); *California Correctional Peace Officers v. State of Cal.*, 189 Cal.App. 4th 849 (2010).

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

irrespective of whether they actually return to their starting point at the end of the day, they are paid for their time based on the "scheduled running time" that it would take public transit (i.e. a different bus or BART) to return to the starting point. ***Ex. 52** (Skowbo Dec.),* ¶ *21*. All ending points are located near bus stops or BART stations. The "scheduled running time" is the time published by the District or BART that it takes for public transit to travel to a location during peak travel times, which are the morning and evening rush hours. *Id.* at ¶ 20.

Section 54.02 of the CBA defines split-shift travel as travel resulting from "unpaid breaks in split runs where the second part of the run picks up at a point different from where the first part leaves off." ***Ex. 50** (Cardiff Dec. at Exs. Q & R § 54.02).* When the break between parts is sixty minutes or less, it is paid as regular time worked, including any time spent in travel. *Id.* at § 62. Plaintiffs' claims regarding split-shift travel refer to travel between the ending point of the first part of the run and the starting point of the second part of the run, when the break between the two parts is more than sixty minutes. Drivers are paid straight time rates for their imputed travel time between points in this situation. ***Ex. 50** (Cardiff Dec. at Ex. R, § 54.02).*

Prior to a June 11, 2008, contract modification, drivers were paid for start-end travel time and split-shift travel time (if their breaks between shifts were greater than sixty minutes) at straight time based on the "scheduled running time of the service then available." ***Ex. 51** (Declaration of Kathleen Kelly filed October 15, 2009 [docket #83]),* ¶ *3*. On June 11, 2008, the CBA was modified to provide that travel time would be paid at straight time "except when such travel causes a driver's total work time to exceed 8 hours per day or 40 hours per week, in which case such overtime travel shall be compensated at straight time, plus 15% as an overtime premium." ***Ex. 50** (Cardiff Dec. at Ex. R,, § 54.01).*

**4. The 2007-2008 Negotiations**

Plaintiffs argue that their counsel's communications to the District show that the District acted in "bad faith" and committed "willful" violations of the FLSA because those communications supposedly put the District "on notice" of its alleged violations. However, while it is true that certain communications put the District "on notice" of plaintiffs' counsel's view of the law, those

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

communications also reveal, not surprisingly, that the District disputed plaintiffs' counsel's positions, and that the District nonetheless agreed to discuss the matter in collective bargaining negotiations with plaintiffs' union, which is represented by the same firm as are plaintiffs in this case. One such communication is an email from plaintiffs' counsel to the District's counsel dated June 19, 2007. *Ex. U to Monrad 5-19-11 Dec.* That email confirms both the District's "continued disagreement with the union's position" that it was violating the FLSA *and* the District's willingness to nonetheless discuss the issue with the plaintiffs' union during negotiations.[11] *See also Monrad 5-19-11 Dec. at ¶¶. 13-12* describing portions of the parties negotiation and litigation history, which spanned several years. At all times, the District engaged in good faith negotiations of all of the Union's claims. For his part, plaintiffs' counsel took the position in his June 19, 2007, email that the parties' disagreement as to whether split-shift or start-end travel time were compensable "hours worked" under the FLSA involved a "non-negotiable" FLSA requirement, but plainly (as the email reveals), the District did not agree with that position.

The District's former General Manager, Rick Fernandez, explained at his deposition, "[d]uring the 2007 negotiations, we had taken this issue up and addressed it in great length and came to what we feel is a resolution to [the] dispute whether it be valid or not. When I say 'valid or not,' the dispute valid or not." ***Ex.*** *7 (R. Fernandez) pp. 40:17-22.* In other words, even though the District did not agree that the union's (and now these plaintiffs') legal position was valid, the District nevertheless negotiated with the union to arrive at what Fernandez believed to be a resolution of the issue. "So, in the contract that began July 1, 2007, there was a new clause put into the contract regarding how travel time would be paid." *Id. at 40:23-25 & Ex. 5050 to his deposition.*[12]

---

[11] Other communications *from* plaintiffs' counsel to the District confirm that the District was not merely "disagreeing" without any support for its position, but instead was relying on the same authorities cited in its briefs to this Court on the parties' cross-motions for summary judgment, including *United Transportation Union, Local 1745 v. City of Albuquerque*, 178 F.3d 1109 (10th Cir. 1999), as well as the inherent difficulty of tracking travel time, which makes it an appropriate subject for resolution by the District and ATU in its collective bargaining agreement. *See e.g.* ***Ex.*** *7 (R. Fernandez) at p. 30:3-13 & Ex. 5045 thereto.*

[12] The negotiations were completed, and the amendment (Exhibit 5050) signed, on June 11, 2008. However, the document recites that the amendment was effective as of July 1, 2007. *See* ***Ex.*** *7 (R. Fernandez) pp. 43:14-44:11 & Ex. 5050 thereto.*

Fernandez negotiated the changes primarily with Yvonne Williams, an opt-in plaintiff who was the president of ATU at the time. ***Ex.*** *7 at 46:16-19.* "[O]ne goal during that negotiation was to satisfy both parties as it relates to how travel time would be paid and ultimately I believe we were successful in doing that." *Id. at pp. 41:22-24; 42:1-2.*

At one point during the negotiations, the District actually proposed to pay travel time at a lower hourly rate than the standard hourly rate, but also pay time and a half if travel time resulted in "overtime." However, that proposal was rejected and the union the proposed the 15% premium that the parties ultimately agreed to. ***Ex.*** *37 (Y. Williams) at 171:2-173:17.* Moreover, during the negotiations, Williams told Fernandez that agreeing to the 15% premium would satisfy the union regarding the FLSA. ***Ex.*** *7 (R. Fernandez) pp. 46:20-25.* Moreover, Fernandez testified that he actually believed the amendment he negotiated in 2008 satisfied the requirements of the FLSA. *Id. at 49:20-50:1, with email from Phillip Monrad to court reporter changing "FMLA" to "FLSA."*

**D. Plaintiffs' Damages Calculations**

The manner in which plaintiffs' expert has calculated the damages allegedly owed to the plaintiffs raises a number legal issues as to which the District also seeks summary adjudication.

**1. Premium Payments Not Taken Into Account as Credits**

Plaintiffs do not take into account all premiums that are creditable against overtime payments due under the FLSA. In particular, plaintiffs apply only three of five credits to which the District contends it is entitled: (1) a credit for daily overtime paid, (2) a credit for the .15 overtime premium for travel that causes an employee to exceed eight hours in a day that has been paid since June 11, 2008, and (3) a credit for premium payments to employees who work on holidays. However, plaintiffs do not give the District credit for the elapsed/spread time premiums paid, nor do they give the District credit for the premiums paid to drivers when they work on their scheduled day off. In addition, with respect to all of the premium payments for which the plaintiffs have given the District a "credit," their expert only applied the credit to the overtime that would otherwise be due in the same workweek (the "workweek-by-workweek" method), as opposed to applying the total of all applicable premiums paid to each driver during the entire class period as a credit against all overtime

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

payments that would otherwise be due (the "aggregate" or "cumulative" method).

The effect of plaintiffs' failure to give credit for all of the applicable premiums is significant. defendant's expert has used plaintiffs' expert's data to calculate the value of the credit for the spread time premium and has concluded that applying that premium alone would result in a 62.1% reduction of the claimed damages if the workweek-by-workweek method is used and an 84.4% reduction if the aggregate, or cumulative method, is used. *See May 10, 2011, rebuttal report of Phillip Allman attached as Exhibit 3 to Breshears Dec.* In addition, using the cumulative method to calculate all of the applicable premiums would further reduce the amount owed to the plaintiffs. *Id.*

**2. Regular Rate Improperly Calculated**

Plaintiffs have not only failed to give the District a credit for the spread time premiums paid to drivers, but they also included those premium payments in calculating the regular rate, resulting in a higher rate. *See Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.).*

**3. Non-Overtime Compensation Improperly Included**

Plaintiffs' expert has not only included overtime payments in his calculation (time and one-half for all hours worked over 40 in a workweek), he also included amounts claimed to be due for uncompensated straight time. *See Ex .2 to Breshears Dec. (Regan 2nd Suppl. Rpt.).* However, the plaintiffs did not bring a claim for uncompensated straight time in this action.

**4. No Accounting for De Minimis Claims**

Plaintiffs' expert makes no accounting for *de minimis* amounts of overtime.

**E. The April 10, 2007 Settlement**

On April 10, 2007, the District entered into a settlement agreement that fully resolved all issues (including the drivers' FLSA claims) relating to start-end and split-shift travel time for the period up to and including August 7, 2006. ***Ex. 49*** *(Ex. 22 to Monrad 10-1-09 Dec. [docket # 71-5]).* In his October 1, 2009, declaration, Monrad asserted that the April 2007 settlement only resolved the plaintiff drivers' claims relating to start-end travel time, but that is not accurate. The agreement recites that it resolves all claims including FLSA for travel resulting from runs having "different starting and ending points, *including different portions of split runs.*" *Id.* Despite this agreement,

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

and despite the fact that plaintiffs' Complaint itself limits the purported "class period" to the period "since August 7, 2006,"[13] plaintiffs' expert has included in his damages calculations amounts claimed to be owed for the period prior to August 8, 2006. *Ex. 2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Ex. 2A thereto.*

## III. ARGUMENT

### A. This Case Should Be Decertified as a Collective Action.

Section 16(b) of the FLSA provides employees with a private right of action to sue an employer for violations of the Act on a collective basis, "for and in behalf of himself or themselves and other employees similarly situated." *29 U.S.C. § 216(b)*. To join an FLSA "collective action" as a plaintiff, an employee must affirmatively opt-in by filing a written "consent to join" in the court where the action is pending. *Id.* Some courts have even required that the consent specifically state that the opt-in plaintiff consents to be represented by the named plaintiffs' counsel. *Gilbert v. Citigroup, Inc., 2009 U.S. Dist. LEXIS 18981, at *10-11 (N.D. Cal. Feb. 18, 2009).*

A majority of courts, including district courts in the Ninth Circuit, have adopted an ad hoc, two-tiered, case-by-case approach for assessing whether an FLSA action should proceed on a collective basis. *See, e.g., Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03 (10th Cir. 2001); Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001); Gerlach v. Wells Fargo & Co., No. 05-0585, 2006 U.S. Dist. LEXIS 24823, at *5-6 (N.D. Cal. Mar. 28, 2006); Kress v. PricewaterhouseCoopers, LLP, 263 F.R.D. 623, No. 08-0965, 2009 U.S. Dist. LEXIS 117949, 2009 WL 4269465, at *3 (E.D. Cal. Nov. 25, 2009); Lewis v. Wells Fargo & Co., 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009); Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004).*" At the first stage, the district court approves conditional certification upon a minimal showing that the members of the proposed class are 'similarly situated'"; *Gilbert, supra, 2009 U.S. Dist. LEXIS 18981 at *3 (N.D. Cal. 2009).* For the first stage analysis "the court requires little more than substantial allegations, supported by declarations or discovery, that 'putative class members were together the victims of a single decision, policy, or plan.'" *Gerlach., supra, 2006 U.S. Dist.*

---

[13] **See, *Ex. 49*** (Complaint), ¶6

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

*LEXIS 24823, at *2-3 (quoting Thiessen, 267 F.3d at 1102-03).*

The second stage usually occurs after discovery is complete and the case is ready for trial, at which time the court engages in a more searching review of the collective action. *See, Leuthold v. Destination America, Inc., 224 F.R.D. 462, 467 (N. D. Cal. 2004).* The second-tier analysis is generally triggered by a motion to decertify. *Id.* During this second stage review, the court "must make a factual determination regarding the propriety and scope of the class by considering the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Leuthold, supra, 224 F.R.D. at 467.*

**1. The Disparate Factual Settings Affecting the Issues That Remain To Be Decided On the Plaintiffs' Split-Shift Travel Time Claims Make This Case Not Appropriate to Be Continued as a Collective Action**

"Decertification is appropriate where plaintiffs are subject to varying work conditions in different work locations . . .. [citations omitted]". *Reed v. County of Orange, 266 F.R.D. 446, 450 (C.D. Cal. 2010). Reed* was a collective action by deputy sheriffs who raised multiple unpaid overtime claims. In decertifying the class as to all but the donning/doffing claims, the district court noted the plaintiffs worked in a variety of locations and divisions and the plaintiffs' off-the-clock claims involved "time not regularly worked by all members of the class". *Id. at 450*, citing *Lawrence v. City of Philadelphia, 2004 U.S. Dist. LEXIS 8445, 2004 WL 945139 (E.D. Pa. 2004).* The variety of differences in the *Reed* plaintiffs' non-doffing/donning claims included over 100 separate work locations where a plaintiff may have worked and different practices amongst the plaintiffs as to if and when they engaged in certain activities. *Id. at 451 & 453.* The *Reed* court also noted that some plaintiffs had no overtime claim at all, some had only a minimal donning/doffing claim, and some had more substantial claims. *Id. at 453-454.* The amount of time being claimed varied from 0 minutes to 25 minutes. *Id. at 454.* Ultimately, this led to the conclusion that individual factors predominated such that there was not a "representative" plaintiff and that proceeding as a collective action would result in either underpayment or overpayment of certain claims. *Id. at 455.* Because of the disparate factual settings, the *Reed* court noted that if the case

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

proceeded as a collective action, the defendant would be deprived of a "meaningful opportunity to cross examine the vast majority of the opt-in plaintiffs concerning time worked." *Id. at 454, fn. 7.* See also, *Frye v. Baptist Memorial Hosp. 2010 U.S. Dist. LEXIS 101996 (W.D. Tenn. 2010),* where the court noted that it must balance "the reduced cost to individual plaintiffs and any increased judicial utility that might result from collective action against the potential detriment to the defendant and any possible judicial inefficiency." *Id. at *26, citing Hoffmann-La Rouche, Inc. v. Sperling, 493 U.S. 165, 169-70, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1980).*

In *Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935 (9th Cir. 2009),* a rule 23 class action, the plaintiffs all engaged in the activities at issue (working inside and outside of the office), but the amount of time spent by any individual plaintiff "varied greatly". *Id. at 938.* This led the court to be especially concerned with an evidentiary question -- the number of issues susceptible to common proof – the answer to which supported not certifying the proposed class. *Id. at 946.* As in *Vinole*, the instant case may involve the same "types" of evidence (payroll data and bus running times, for example) and the same employer payroll practice, but that does not mean the plaintiffs have uniform experiences in engaging in split-shift travel. *Id.; see also, England v. New Century Fin. Corp., 370 F.Supp.2d 504 (M.D. La. 2005),* holding that collective action determination "is appropriate when there is 'a demonstrated similarity among the individual situations . . . **some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.**' [citation omitted]". *Id. at 507-508, emphasis in original.*

**a. The named plaintiffs are not representative of the opt-in plaintiffs and have not acted as representatives.**

The instant matter suffers from the same problem as occurred in *Reed* and *England*, *supra,* namely that individual issues predominate. The named plaintiffs are not particularly similar to each other, let alone the other 1360+ class members. Robbins has no damages because he never worked more than 4 hours in a day as a bus driver. During the class period, Wilkins spent less than 50% of her time as a bus driver and worked almost exclusively in D3. Gilmer spent his entire career in D4.

FOSTER employmentlaw 3000 Lakeshore Avenue Oakland, California 94610

Williams, who has not operated a bus since November 2008, spent the time period to that in D2. Finally, Robbins (badge number 32041) has never worked as a bus driver more than 40 hours in a week since January 2006. His expert estimates he has no damages if a two year statute of limitations is applied and $15.92 if a three year statute is applied. *Ex. 2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Exs. 2A & 2B thereto; Petersen Dec. ¶ 5.*

Moreover, not one of the named plaintiffs engaged in split shift travel exclusively using the mode of transportation they are assuming for the class (bus only or a BART and bus combination). Plaintiffs' expert states that a significant factor in the amount of time it takes drivers to engage in split-shift travel is the division in which it occurs. ***Ex. 25*** *(D. Regan) pp. 103:2-21.* Yet the named plaintiffs were all based in different divisions, and none of them identified D6 (the division where the travel times were the longest) as their home division.

**b. Testimony of 38 drivers establishes multitudinous experiences.**

From the District's records and the fewer than 40 depositions defendant took, a wide variety of experiences were revealed. For example, according to the date of plaintiffs' expert, some drivers did not engage in split–shift travel, some not in start-end. *Petersen Dec. ¶ 6.* Some worked a mixture of divisions, some were exclusively in one division. *Petersen Dec. ¶ 7.* Moreover, each of the 1,360+ drivers in the class will claim a different amount of actual split-shift travel time based on a variety of factors. *Ex. 2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Exs. 2A & 2B.*

The mode of transportation employed not only varied amongst the drivers, but an individual driver usually utilized multiple modes. Many testified about periodically riding in a car between LocOn/LocOff points. Harold Kurz had a regularly assigned run which ended in Alameda; 40% of the time Kurz arranged to have another driver pick him up and drive him back to division. ***Ex. 17*** *(H. Kurz) pp. 32:3-34:3.* On another run, Kurz parked his car at Mills College, which was the ending point of his first shift, prior to the start of work. *Id. at 40:4-40:12.* This enabled him to drive between points of his split shift rather than ride the bus. *Id. at 40:4-41:11.* Kurz was not the only driver who used his own car to travel between points on split shift. *See also,* ***Ex. 8*** *(L. Fowler) pp. 49:11-19);* ***Ex. 4*** *(B. Carter) pp.16:8-17:13 & 25:14-26:10;* ***Ex. 5*** *(A. Dill) pp. 50:21-51:2, 52:12-*

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

*14, & 52:23-53:1;* ***Ex. 35*** *(T. Wilson) pp.30:24-31:5, 63:1-8.* Ernest Jackson used his car about half of the time to drive between splits when the LocOn/LocOff points involved Winton and Hesperian, Hayward. ***Ex. 11*** *(E. Jackson) pp. 21:19-22:5, 25:13-19, 26:11-18; & 27:7-13.* Driving for Jackson took about six minutes, whereas waiting for and taking the bus took 20 to 25 minutes. *Id. at 22:9-11, 23:12-18, 26:23-27:6.*

Drivers would also occasionally get car rides from other drivers. *See,* ***Ex. 34*** *(K. Williams) pp. 19:24-20:5;* ***Ex. 15*** *(B. Jones) pp. 11:13-17, 16:7-13, 17:22-18:2;* ***Ex. 22*** *(C. Nibblett) pp. 20:14-18;* ***Ex. 36*** *(S. Winfrey) pp. 41:15-42:6, 12:25-13:5, 17:1-18:2;* ***Ex. 18*** *(D. Lyons) pp. 29:12-25, 20:2-13;* ***Ex. 28*** *(H. Singh) pp.28:25-29:7; and* ***Ex. 21*** *(I. Neal) pp. 72:1-6.* Mr. Neal also occasionally drove another bus operator's car between parts of a split. ***Ex. 21*** *(I. Neal) pp. 72:10-12.*

To save time, several drivers testified that they walked instead of riding the bus. ***Ex. 1*** *(Y. Lomax-Binion) pp. 32:6-33:11;* ***Ex. 15*** *(B. Jones) pp.21:5-8;* ***Ex. 18*** *(D. Lyons) pp. 10:25-11:19, 14:24-15:6.* Drivers also walked when they missed busses or did not want to wait. ***Ex. 16*** *(T. Johnson) pp. 18:16-19:3, 50:21-51:1;* ***Ex. 22*** *(C. Niblett) pp. 16:18-22;* ***Ex. 28*** *(H. Singh) pp.9:17-10:6, 11:13-20, 12:25-19;* ***Ex. 4*** *(B. Carter) pp. 23:20-25:8; &* ***Ex. 12*** *(R. Jackson) pp. 9:20-10:9.* It was not uncommon for drivers to choose to walk simply because they wanted to without regard to the amount of time it took. *See, e.g.,* ***Ex. 1*** *(Y. Lomax-Binion) pp. 32:6-33:11;* ***Ex. 16*** *(T. Johnson) p. 30:15-23;* ***Ex. 15*** *(B. Jones) pp. 17:17-21, 22:17-24;* ***Ex. 22*** *(C. Niblett) pp. 16:18-20;* ***Ex. 31*** *(A. White) pp. 25:1-22;* ***Ex. 34*** *(K. Williams) pp. 17:5-13, 13:17-14:4; 41:25-42:23; &* ***Ex. 36*** *(S. Winfrey) pp. 15:15-16:13.*

The drivers' testimony showed that they rode BART more and less often than assumed in plaintiffs' damages calculations using 511.org data. Stephen Winfrey took BART from Del Norte to Richmond BART, even when the District did not pay for it. ***Ex. 36*** *(S. Winfrey) pp.28:24-30:9, 34:9-35:4.* Walter Edwards rode BART to travel between Union City and Hayward, which was faster, even when he had to pay for it himself. ***Ex. 6*** *(W. Edwards) pp. 30:1-31:14, 45:8-17; see also,* ***Ex. 11*** *(E. Jackson) pp.15:11-17, 18:13-24, 30:6-23, & 31:7-11, &* ***Ex.30*** *(D. Trautner) p. 64:1-15.* Angelique White testified that, although the District had a policy of offering BART tickets,

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

the tickets were not always available. ***Ex. 31*** *(A. White) pp. 34:13-35:6;* <u>*see also*</u>, ***Ex. 19*** *(G. Martin) pp.35:10-22, 36:25-37:7.* Other drivers did not necessarily ride BART, even when the District provided tickets. ***Ex. 24*** *(D. Reed) pp. 18:13-19:13; 31:20-32:4, 33:9-15, 35:20-36:15; &* ***Ex. 30*** *(D. Trautner) p. 64:1-15.*

Drivers also testified that they would travel between LocOn/LocOff points by riding on a bus that was being "deadheaded". ***Ex. 19*** *(G. Martin) pp.29:20-30:11, 33:17-25;* ***Ex. 36*** *(S. Winfrey) pp. 12:22-13:5, 17:1-18:5;* ***Ex. 16*** *(T. Johnson) pp. 16:18-24, 29:20-24;* ***Ex. 15*** *(B. Jones) pp. 17:22-24;* ***Ex. 8*** *(L. Fowler) pp.48:22-49:2;* ***Ex. 14*** *(E. Jensen) pp.42:20-23;* ***Ex. 3*** *(D. Brown) 53:4-6; &* ***Ex. 31*** *(A. White) pp. 20:16-21:10.* For one of Ernest Jackson's runs, he traveled by deadhead bus between his two split runs every day. ***Ex. 11*** *(E. Jackson) pp.49:3-14, 50:6-17, 54:16-55:7.* For one of John Nusbaum's runs, he caught a deadhead bus every day for four and one-half months. ***Ex. 23*** *(J. Nusbaum) pp. 23:4-24:18.* When James Massie travelled between D4 and Fruitvale BART station, he usually rode a deadhead bus on which other drivers were also travelling. ***Ex. 20*** *(J. Massie) pp. 24:23-25:12.*

Below is a graph to aid the Court in understanding the extent of the differences between what the drivers actually did and what plaintiffs' counsel is asking the fact-finder to assume in order to be able maintain this as a collective action:

Opt-In Plaintiff's Split Shift Travel

Drove a car, 7 of 38
18.4%
Rode in a car, 8 of 38
21%
Rode a deadhead, 11 of 38
29%
Walked, 11 of 38
29%
Rode BART more, 4 of 38
10.5%
Rode BART less, 4 of 38
10.5%

Named Plaintiff's Split Shift Travel

Drove a car, 4 of 5
80%
Rode in a car, 2 of 5
40%
Rode a deadhead, 2 of 5
40%
Walked, 1 of 5
20%

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

**c. Travel Patterns Vary Significantly From One Division To Another**

Plaintiff's expert, D. Paul Regan, noted that the amount of travel time being claimed by a driver was greatly influenced by which division the driver worked. *Ex. 25 (D. Regan) pp. 121:8-122:08.* As Regan noted, "the average [travel time] by division is different because the patterns of travel are different within the division." *Id. at 103:2-21.* The differences in travel patterns were so disparate, that Regan said if he were to interview drivers as a method of estimating travel time, one would have to "stratify your discussions by division, and because you're likely to get disparate times you're going to have to talk to a lot of plaintiffs." *Id. at 121:14-24.* As Regan put it, "you have different results depending upon what division you're in." *Id. at 122:7-8.* As in *Reed v. County of Orange, supra,* these wide variations in time mean that plaintiffs are not similarly situated.

Reviewing the individual claims as stated in Regan's report reflects the dissimilarity amongst the plaintiffs. For example, assuming a two year statute of limitations, 71 plaintiffs did not work and therefore had no claims; 24 who actually did work had no overtime owing; and 11 had claims of less than $20. *Brown Dec. ¶ 46 & Ex. 2 to Breshears Dec. (Regan 2nd Suppl. Rpt.) at Ex.2B.* According to the data used by plaintiffs' expert, 94 drivers of 1361 who did not engage in any split–shift travel and 173 drivers who did not engage in any start-end start end travel (assuming a 3-year statute of limitations). *Petersen Dec. ¶6.*

**2. Allowing this Case to Proceed as A Collective Action Will Deny the District a Meaningful Opportunity to Present Available Defenses To Each Plaintiff's Split-Shift Travel Time Claim.**

The second factor to examine in deciding whether a collective action is a superior method of proceeding is the available defenses that need to be litigated on an individual basis. As shown above, there are multiple factual issues available for use in defending claims if they were brought on an individual basis. The mode of transportation, the time of day, even whether there were faster routes on a bus than is published on the current 511.org website. However, because this case proceeded as a conditionally certified "collective action" through the discovery phase, the District was denied the opportunity to explore these individualized issues with any but a very small fraction of the plaintiffs. *See 1-13-11 Order, Ex. SS to Monrad 5-19-11 Dec.*

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

During discovery, the District was denied the opportunity to ask each plaintiff about his or her own actual split-shift travel. As such, if this case is permitted to proceed to a trial in which one of the most critical issues, pursuant to this Court's earlier order, will be "the exact amount" of each plaintiff's split-shift travel time, the District will be severely hamstrung in its ability to challenge the assumptions that underlie plaintiffs' calculations. For example, plaintiffs' expert calculated damages for 111,911 "driver weeks" (weeks in which a driver had the possibility of having a damages claim). Of those, over 6,100 weeks (5.4%) involved time worked by a plaintiff but not as a driver (eg., committee work). *Petersen Dec.* ¶ *8.* Questioning the opt-ins regarding the hours they actually worked (rather than assuming they worked 7-8 hours) would be the most obvious and effective means for the District to test the evidence. However, the District was not permitted to take any discovery from the opt-in plaintiffs on this issue.

Additionally, courts have recognized an employer's right to argue as a defense that an employee's claim is *de minimis* because it involves a few minutes. *Lindow v. U.S., 738 F.2d 1057,1062-1063 (9th Cir. 1984).* This is usually in the context of work which is 10 minutes or less per day. *Id. at 1062.* In the present case, the spreadsheets prepared by plaintiffs' expert to "prove" overtime are so complex, that examining the claims of each plaintiff in an attempt to identify *de minimis* claims would have been too time-consuming. *Petersen Dec.* ¶ *9.*

### 3. Fairness And Procedural Considerations Also Support An Order Decertifying This Case As A Collective Action

In evaluating fairness and procedural considerations, "the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Reed, supra, at 463.* Because non-parties to a collective action are not subject to claim preclusion, certifying a collective action "has less to do with the due process rights of the potential plaintiffs and more to do with the named plaintiffs' interest in vigorously pursuing the litigation and the district court's interest in 'managing collective actions in an orderly fashion.'" *McElmurry v. U.S. Bank Nat. Assoc., 495 F.3d 1136, 1139 (9th Cir. 2007)* citing *Hoffmann-LaRoche, supra, 493 U.S. at 173.* Even if plaintiffs establish they are

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

similarly situated to the opt-in plaintiffs, the next step is to establish that a collective action is a superior procedure of resolving the controversies at hand. *Beauperthuy v. 24 Hour Fitness USA, Inc., 2011 U.S.Dist. LEXIS 24768, *14 (N.D. Cal. 2011).*

Courts are permitted to award back wages under the FLSA to non-testifying employees if they can present fairly representative testimony of other employees under the *Mt. Clemens Pottery* standard. *McLaughlin v. Seto, 850 F.2d 586, 589 (9th Cir. 1988).* In fact, plaintiffs cited *Anderson v. Mt. Clemens Pottery, 328 U.S. 680, 66 S. Ct. 1187; 90 L. Ed. 1515 (1946)* to justify their use of 511.org data rather than evidence from the plaintiff. *Pltfs. Reply ISO Mo. For Prot. Order (Dock. # 151) p. 6:1-4* ["Plaintiffs in an FLSA case need only prove their damages by 'just and reasonable inference.'"]. Here, the testimony of only 38 plaintiffs can hardly be considered "fairly representative," and if additional plaintiffs are permitted to testify at trial but defendant was denied the opportunity to depose those plaintiffs, that would be fundamentally unfair to the District. Moreover, the limited discovery that the District was permitted to obtain demonstrates that 511.org data is not "fairly representative" of the actual split-shift travel time of the plaintiffs.

More importantly, plaintiffs in this case are not attempting to present evidence through representative employees; instead they intend to present "representative evidence" of actual travel time and actual work time without regard to what the employees actually did. The reason plaintiffs intend to use this "representative evidence" for establishing liability and damages is because ***there are no representative plaintiffs***. The 1360+ plaintiffs travelled between different locations, on different modes of transportation, at different times of day, for vastly different time periods. They also had different practices regarding whether they went directly to the beginning part of the second part of the run and whether they did errands in between; some even used that time to go home. *See, e.g.,* ***Ex. 22*** *(C. Nibblett) pp. 21:17-22;* ***Ex. 36*** *(S. Winfrey) pp. 18:13-19;* ***Ex. 18*** *(D. Lyons) pp. 10:25-11:8, 12:16-24, 19:23-20:1, 27:5-12;* ***Ex. 15*** *(Jones) pp. 10:14-11:2 & 18:13-19* [drivers who always returned to division]; ***Ex. 13*** *(N. Jennings) pp. 8:14-10:5;* ***Ex. 21*** *(I. Neal) pp.84:1-85:8; &* ***Ex. 2*** *(T. Brar) pp. 50:7-51:21* [drivers who sometimes returned to division]; ***Ex. 3*** *(D. Brown) pp.53:21-54:6, 40:24-42:18, 49:10-24;* ***Ex. 11*** *(E. Jackson) pp. 17:22-18:12;* ***Ex. 20*** *(J. Massie) pp.*

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

*14:14-25;* ***Ex. 15*** *(B. Jones) pp. 35:1-6, 35:21-25, 10:22-11:2, 10:14-11:2, &* ***Ex. 10*** *(C. Hargrove) pp. 19:11-20:3;* ***Ex. 12*** *(E. Jackson) pp. 50:22-7,* ***Ex. 14*** *(E. Jensen) pp. 30:10-31:11,* ***Ex. 21*** *(I. Neal) pp.83:11-25, &* ***Ex. 28*** *(H. Singh) pp:12:25-13:12; 17:20-18:11* [drivers who did errands or went home between shifts].

**a. This Is Not A *Mt. Clemens Pottery* Factory Setting Case**

The situation in the present action is NOT analogous to *Anderson v. Mt. Clemens Pottery, supra, 328 U.S. 680,* where employees clocked-in and out of work, but had to walk across the factory floor before arriving at their work station. The employer subtracted some of the employees' time because it did not consider the activity of walking to be work. *Id. 683-684.* In *Mt. Clemens*, all plaintiffs traveled across a factory floor for relatively the same distance (130 feet to 890 feet). *Mt. Clemens at 683*. Also, all employees walked. *Id.* While the time to walk varied, the estimates ranged from 30 seconds to 8 minutes. *Id.* It was undisputed that the work had been performed and it was further undisputed that the employees had not been paid for that work. *Id. at 688.* The dispute was the amount of time employees engaged in walking. Because of the employer's lack of records, the court allowed for "approximate" damages to be awarded, but directed that the amount "approximated" must be a matter of "just and reasonable inference." *Id. at 687.* The Supreme Court specifically rejected the employer's argument that the damages claims were not precise enough, stating, "That rule applies only to situations where the fact of damage is itself uncertain." *Id. at 688.*

Where the fact that an employee has suffered damages is undisputed and the employer lacks documents showing the amount and extent of the work, *then* the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id. at 687-688.* However, in this case the District cannot present such evidence because it was not permitted discovery from the individual plaintiffs. Moreover, the evidence in dispute is directly relevant to whether damages have been suffered at all.

To say the facts in this case are analogous to *Mt. Clemens* is to say that the plaintiffs in this case travelled over 230 different factory floors for which travel time has to be determined. As

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

shown in the plaintiffs' expert's report, the distances of those 230+ factory floors range from approximately 100 yards to over 10 miles. The travel time at issue in *Mt. Clemens* was less than 10 minutes. *Id. at 683.* In the instant matter, the range of imputed travel time is from 1 minute to 178 minutes. Moreover, each of the 230+ factory floors at issue in this case was traversed using multiple methods of travel. In *Mt. Clemens,* the plaintiffs' experiences were sufficiently similar such that one could extrapolate from the sample plaintiffs what each plaintiff would likely be owed. However, with over 1,360 class members and a time period of over five years, there is no baseline from which to extrapolate, and any "rough estimate" in this case would lead to unjust calculations.

Defendant does not argue that in individual circumstances, plaintiffs' method of using 511.org data to estimate travel time will always be unreasonable. However, when it is used for each plaintiff each time split-shift travel was engaged in, then it becomes unreasonable because it does not take into account facts which both sides know to be true. Further, when this one-size-fits-all method is employed simply because it is too difficult for plaintiffs' counsel to calculate damages because of the class size, then it becomes a case of the tail wagging the dog. This becomes even more evident with the named plaintiffs' testimony that they (1) did absolutely nothing to try to determine damages, and (2) that they did not even review their responses to interrogatories which sought information regarding the class's damages claims until *after* the responses were served on their behalf. *Brown Dec. ¶ 44 &* ***Ex. 42*** *(Gilmer's Amended Rsp. To Interrogs. Set.2 );* ***Ex. 32*** *(D. Wilkins), pp. 204:15-205:24;* ***Ex. 33*** *(J. Williams) pp. 199:14-200:3 & 201:2-10 & Exs. 32 & 33 thereto.*

**b. Given the issues to be decided in light of this Court's prior Order, the case is simply not manageable as a collective action.**

As stated by the Third Circuit, "[u]sed properly, [a collective action] reduces multiplicity of suits and offers a convenient means of settling issues common to a large number of persons whose interest is sufficiently similar. *Lusardi v. Lechner, 855 F.2d 1062, 1071 (3rd Cir. 1988).* In the instant matter, the collective action has served its purpose -- it has settled the issue whether travel time constitutes hours worked for FLSA purposes and it can be used to settle issues regarding what is included in calculating credits. Those are questions where the facts are not in dispute and the

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

issue is a matter of law. The next step is to apply those legal holdings to a variety of factual settings. However, there are no representative plaintiffs from whom a jury can decide liability and damages. Therefore, the plaintiffs are demanding that the finder of fact assume each driver's experience was the same so that the plaintiffs can present generic evidence to establish damages for each plaintiff. This method is not fair to either side, as some plaintiffs will be overpaid and some underpaid. *See Reed, supra, 266 F.R.D. at 455.*

It is important to remember that decertifying this class does not mean the opt-in plaintiffs are without a remedy. They are free to file individual actions and there are published cases showing that opt-in plaintiffs do proceed individually. See, *O'Brien v. Ed Donnelly Enters., 575 F.3d 567, 573 (6th Cir. 2009)* [affirming dismissal of the opt-in plaintiffs and noting that most later filed individual actions]; *Fox v. Tyson Foods, Inc., 519 F.3d 1298, 1301 (11th Cir. 2008)* [affirming decertification of an FLSA collective action, dismissal of the opt-in plaintiffs, and severance of named plaintiffs into multiple individual actions].

**c. Because The Court And Defendant Were Not Involved In Drafting Notice To The Class, It Cannot Even Be Assumed That The Opt-In Plaintiffs Believe They Have Legitimate Travel Time Claims.**

The importance of the *initial* certification is that it authorizes either the parties or the court to facilitate notice of the action to similarly situated employees. *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1218 (11th Cir. 2001).* The benefits of a collective action "depend on employees receiving accurate and timely notice . . . so that they can make informed decisions about whether to participate." See *Hoffmann-La Roche, supra, 493 U.S. at 170.*

In *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462 (N. D. Cal. 2004), this Court grappled with the issue of whether it should use the first stage or second stage criteria. It decided to proceed at that point in time with the first stage inquiry because the "number and type of plaintiffs who choose to opt into the class may affect the court's second tier inquiry regarding the disparate factual and employment situations of the opt-in plaintiffs, as well as fairness and procedural issues". *Id. at 468; see also, Gilbert, supra, 2009 U.S. Dist. LEXIS 18981, at *16-17 (N.D. Cal. 2009)* [following objections by employer-defendants, plaintiffs agreed to remove caption from notice to

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

class and court granted request that language be added to notice informing potential plaintiffs of decision-making powers of named plaintiff].

Plaintiffs in the instant matter did not move for an order approving the notice. As such, neither the District nor the Court knows the content of the notice sent to potential plaintiffs. And the language in the consents filed with the court indicates that the opt-ins may have believed there had already been a determination that they were in fact owed money. The consents read:

> I, the undersigned [____], a current or former employee of AC Transit as a fixed route bus driver, hereby consent to join the collective action entitled Gilmer et al v. AC Transit District, U.S. Dist. Court Northern Dist. California, No. C08-05186, and become a party plaintiff in said action arising under the United States Fair Labor Standards Act, ***seeking compensation and related remedies owed to me by AC Transit District for services rendered thereto***, including the District's failure and refusal to pay me the proper rate of pay for all compensable time as required by the Fair Labor Standards Act.

*See, **Ex.** 47 with the consent filed therewith, emphasis added.* The consent form does not indicate that the opt-in plaintiff signing the document actually believed he or she was owed money because of split-shift or start-end travel. Moreover, there is no mention of the person consenting to the named plaintiffs making decisions on behalf of the person signing the consent. These omissions are significant, particularly in light of the fact that it is not even clear that the consents were actually signed by the people whose names appear on them. Given the history of litigation and multiple settlements which preceded the instant action, it is not unreasonable to believe some, if not most, plaintiffs believed the consent was in regard to a prior claim. *Monrad 5-19-11 Dec. ¶¶ 13-26.*

**B. The District Acted in Good Faith and Did Not Willfully Violate the FLSA**

Plaintiffs bear the burden of proving that an FLSA violation was willful. *McLaughlin v. Richland Shoe Co., Inc., 486 U.S. 128, 135 (1988).* And to meet their burden of proving that the District "willfully" violated the FLSA, plaintiffs would have to show that the District "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128, 83 L.Ed. 2d 523, 105 S.Ct. 613 (1985).* If plaintiffs meet that burden, a three-year statute of limitations applies. *29 U.S.C. § 255(a).* Otherwise, a two-year limitations period applies. *Id.*

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

The issue of a defendant's "good faith," although related to the question of whether it willfully violated the FLSA, is distinct. Prevailing plaintiffs in FLSA actions are entitled to recover liquidated damages in an amount equal to their actual damages. *29 U.S.C. § 216(c).* However, if the defendant "shows *to the satisfaction of the court* that the act or omission giving rise to the action was in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not in violation of the [FLSA]," the court may, in its discretion, reduce or eliminate the liquidated damages. *29 U.S.C. § 260; emphasis added.*

Here, there is no evidence whatsoever that AC Transit either knew that it was violating the FLSA or showed reckless disregard for the FLSA. In fact, the parties' extensive briefing prior to this Court's January 2010 order reveals that the District's position with respect to travel time is supported by substantial legal authority. Even though this Court declined to follow the authorities that support the District's position with respect to start-end and split-shift travel time, the District respectfully submits that the existence of such substantial legal authority nonetheless demonstrates as a matter of law that the District did not willfully violate the FLSA.

Moreover, it is undisputed that the District did not unilaterally decide how to compensate employees when they engaged in start-end or split-shift travel, nor did the District unilaterally decide not to count start-end travel time or split-shift travel time as hours worked. Instead, these matters have long been the subject of collective bargaining between the District and the union that represents all of the plaintiffs in the case. The undisputed evidence shows that during negotiations that were concluded only months before the plaintiffs' filed this action, the District and ATU discussed at length their respective positions regarding the treatment of travel time, and whether it was subject to being counted as hours worked for purposes of the FLSA. The District undisputedly disagreed with the argument that travel time should be treated as "hours worked" under the FLSA, but the District actually made a bargaining proposal that would have paid travel time in the manner that this Court has now held that the District must pay it in order to comply with the FLSA, but the plaintiffs' union rejected that proposal and led the District's General Manager, who was handling those negotiations

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

for the District, to believe that adopting the union's counter-proposal would satisfy the union regarding the FLSA and would satisfy the requirements of the FLSA.

**1. The District's Position Is Supported By Substantial Legal Authority, Thus Establishing Its Objective Good Faith**

Generally, the issue of whether a violation of the FLSA was willful is a question of fact to be submitted to the jury. See e.g. *Brinkman v. Department of Corrections, 21 F.3d 370, 373 (10th Cir. 1994).* "However, where an employer has relied on substantial legal authority *or* upon the advice of counsel, a finding of willfulness may be precluded as a matter of law." *Huss v. City of Huntington Beach, 317 F.Supp.2d 1151, 1160-1161 (C.D. Cal. 2000)(emphasis added), citing Service Employees Int'l Union, Local 102 v. County of San Diego, 60 F.3d 1346, 1355-56 (9th Cir. 1994); Baker v. Delta Air Lines, 6 F.3d 632, 645 (9th Cir. 1993).* Here, of course, the District has completely disavowed any intention to rely upon the advice of counsel as a defense to the plaintiffs' contention that the District willfully violated the FLSA.[14] However, *Huss* makes clear that reliance on "advice of counsel" is distinct from a party's reliance on "substantial legal authority."

In this case, the Court can and should conclude as a matter of law, based on the parties' extensive briefing in connection with the earlier cross-motions for summary judgment/summary adjudication, as well as the correspondence from attorney Philip Monrad on which plaintiffs have so heavily relied, that the District's position was at all times supported by "substantial legal authority." The decision of the Tenth Circuit in the *City of Albuquerque*, 178 F.3d 1109 (10th Cir. 1999), case

[14] In their motion for partial summary judgment, plaintiffs ask the Court to draw an adverse inference against the District with respect to the substance of its counsel's advice solely because the District has refused to waive the attorney-client privilege. *See plaintiffs' motion at footnote 3. p. 2.* Not surprisingly, however, plaintiffs cite no authority to support the notion that the Court can or should infer anything solely from the District's assertion of the privilege. Moreover, plaintiffs' counsel apparently believes that the District's refusal to waive its attorney-client privilege means that plaintiffs can just make up "facts." For example, plaintiffs devote a significant portion of their motion to the proposition that the District allegedly "took no steps" to be knowledgeable about the FLSA after the Supreme Court held that the FLSA applied to state and local government entities. However, that is blatantly false, and plaintiffs know it. The plaintiffs know, as a matter of fact, that the District sought and obtained the advice of counsel about the FLSA. *See District's discovery responses cited in plaintiffs' motion.* The fact that the District was forced to agree (as a condition of preserving its attorney-client privilege) that it would not *rely* on its counsel's advice as an affirmative defense hardly entitles the plaintiffs to now assert that as a purported "fact" that the District "took no steps" whatsoever to be knowledgeable about the FLSA.

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

unquestionably supported the District's position on the issue of start-end travel time. The court in that case held, just as the District has always maintained here, that start-end travel time is ordinary commute time, which is not counted as "hours worked."

And even though the Court of Appeals in *City of Albuquerque* held that travel time on city shuttles during a split-shift period was compensable, the court also held that: (a) the "split-shift" period generally was not compensable because the drivers were relieved of all duties, and (b) time spent by drivers travelling during the split-shift period by means *other than city shuttles* was *not* compensable. *178 F.3d 1109, 1117-1119 (10th Cir. 1999*). In other words, the key to the *Albuquerque* court's finding that *some* (but not all) travel time during a split-shift period was compensable was a fact that simply does not exist here. And even as to the *Albuquerque* court's limited conclusion that split-shift travel *by city shuttle* is compensable time, there was a well-reasoned dissent that argued that the entire split-shift period, including travel by any means, is not compensable time. *Id.*

It is clear from plaintiffs' counsel's own correspondence to the District that the District always relied on the analysis in *Albuquerque*, as well as the principle that parties to a collective bargaining agreement can agree to imputed amounts of time (and how such time will be paid) without running afoul of the FLSA, where such time is inherently difficult to calculate. *See e.g. Leahy v. City of Chicago, 96 F.3d 228 (7th Cir. 1996)* [recognizing that "[u]nder the FLSA, employers and employees may make reasonable provisions of contract [to guide] the computation of work hours where precisely accurate computation is difficult of impossible."] As such, the undisputed evidence shows that this certainly is not a case where the District knew its position was wrong or it showed reckless disregard for whether its position was right or wrong. Indeed, the evidence shows that the District's position was actually supported by substantial legal authority upon which the District reasonably relied. For that reason, the Court should find as a matter of law that the District did not act willfully.

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

**2. District Personnel Acted With Subjective Good Faith By Compensating Drivers In Accordance With The Terms Of The Collective Bargaining Agreement And By Relying On The Union's Representations That Modifications Agreed To In June 2008 Would Resolve All Issues Relating To The Compensation Of Drivers For Travel Time**

In assessing the issues of defendant's alleged "willfulness" and its good faith, the Court should not ignore the fact that the District did not unilaterally decide how to treat travel time. The issue of travel time has at all times been a matter subject to the CBA between the District and the uinon that represents all of the plaintiffs. The District's former General Manager, who negotiated revisions to the travel time provisions of the CBA only months before the plaintiffs' filed this lawsuit, has testified that he was led by the plaintiffs' union to believe that the agreement reached during those negotiations brought the District into compliance with the FLSA going forward.

The union's involvement in leading the District's General Manager to believe that these issues were resolved is particularly pertinent since it is the union's counsel who filed this lawsuit shortly after the 2008 agreement was reached. Indeed, the very fact that this lawsuit was filed only months after the union and the District negotiated what the District's General Manager was led to believe was a resolution of these issues, coupled with the fact that this lawsuit was filed by the same counsel who has represented the union for years, smacks of bad faith by the union and its counsel, which this Court should be reluctant to reward by way of liquidated damages or substantial attorneys' fees. Moreover, plaintiffs' counsel's inherent bad faith is made all the more evident by his heavy reliance on the "Timekeeper's Manual," *which was actually created by union members. See **Ex. 29** (Depo. of Maxine Thompson) pp. 8:14-10:14, 11:14-13:1, & 13:10-16.*

Finally, the evidence establishes that the District has been in negotiations with the ATU and plaintiffs' attorney since at least 2004, on a variety of issues, including those at issue in the present litigation. *Monrad 5-19-11 Dec. ¶¶13-27 & Exs. L, M, N, R & S.* Since that time, the parties reached settlements on some, but not all issues. *Id. at Exs. N & S.* The fact that the District continued to negotiate and agreed to pay certain of the claims raised in the 2004 lawsuit is evidence of the District's good faith in the one position it did not settle – the present overtime claims.

For all of these reasons, the Court should find as a matter of law that the District acted in

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

good faith and had objectively reasonable grounds for not counting start-end travel time or split-shift travel time as hours worked for purposes of calculating any overtime to which the drivers may have been entitled. Under these circumstances, the Court should exercise its discretion to order that the plaintiffs are not entitled to recover liquidated damages.

**C. With Respect To Each Plaintiff, The District Is Entitled To Credit All Premium Payments That Were Made To That Plaintiff For "Elapsed" Or "Spread" Time (As Well As Other Premium Payments) Against Any Amounts That Would Otherwise Be Owed Under The FLSA For Hours Worked Over 40 In A Workweek**

Section 7(h) of the FLSA (29 U.S.C. § 207(a)(1)) provides generally that "sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 [minimum wages] or overtime compensation required under this section." *29 U.S.C. § 207(h)(1).* However, "[e]xtra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) shall be creditable toward overtime compensation payable pursuant to this section." *29 U.S.C. § 207(h)(2).*

The three types of "extra compensation" that are described in paragraphs (5), (6), and (7) of subsection (e) are as follows:

(1) premiums paid for daily or workweek overtime (*29 U.S.C. § 207(e)(5)*);

(2) premiums of at least 1.5 times the non-overtime rate that are paid for Saturdays, Sundays, holidays, regular days off, or 6th or 7th days of work (*29 U.S.C. § 207(e)(6)*); and

(3) premiums established by a collective bargaining agreement or other contract that are at least 1.5 times the non-overtime rate of pay (*29 U.S.C. § 207(e)(7)*).

Here, plaintiffs have calculated the amount allegedly due each plaintiff for overtime (and some straight time), using both a two-year limitations period and a three-year limitations period. In his calculations, plaintiffs' expert has given the District credits for (1) the .15 premium paid on travel time since June 11, 2008 (which is creditable under section 207(e)(5)), (2) the premium paid for daily overtime (which is also creditable under section 207(e)(5)), and (3) the premium of more than 1.5 times the employee's non-overtime rate that is paid to employees when they work on a holiday (creditable under section 207(e)(6)). However, there is no indication that plaintiffs' expert has given

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

the District credit for the premiums of 1.5 the employee's non-overtime rate that are paid when employees work on their scheduled day off, and plaintiffs' expert definitely did not give the District credit for any of the spread time premiums it paid.

**1. In Addition To The Premiums That Have Already Been Incorporated Into The Plaintiffs' Expert's Report, The District Is Also Entitled To A Credit For The Premiums Paid When An Employee Works On A Scheduled Day Off**

Drivers are paid a premium of 1.5 times their non-overtime rate of pay when they work on their scheduled day off. *See Stipulations, Ex. AA to Monrad 5-19-11 Dec.* This premium, like the premium for "holiday worked," is creditable under the terms of section 207(e)(6).

**2. The District Is Entitled To A Credit For "Elapsed" Or "Spread" Time Premiums**

Contrary to plaintiffs' assertions, the District is entitled as a matter of law to credit for spread time (also called elapsed time) premiums paid pursuant to the CBA. In *Farris v. County of Riverside*, 667 F.Supp.2d 1151 (C.D. Cal. 2009), the court explained that section 29 U.S.C. § 207(e)(7), "excludes 'extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday . . . or workweek . . ., where such premium rate is not less than one and one-half times the rate established . . . by the contract or agreement. . . .'" *Id. at 1162.* The Department of Labor Regulations interpreting section 207(e)(7) state that, "[t]o qualify as an overtime premium under section 7(e)(7) the premium must be paid because the work was performed during hours outside of the hours established . . . as the basic . . . workday or workweek and not for some other reason." *29 C.F.R. § 778.204(b).*

> Thus, if the basic workday is established in good faith as the hours from 8 a.m. to 5 p.m. a premium of time and one-half paid for hours between 5 p.m. and 8 a.m. would qualify as an overtime premium. . . .

*29 C.F.R. § 778.204(b).* In *Brock v. Willamowsky*, 833 F.2d 11 (2d Cir. 1987), the Second Circuit explained:

> Section 207(e)(7) is also known as a "clock overtime" provision because it deals with premium compensation that is equal to the minimum statutory overtime rate, but is payable

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

> solely on the basis of the time of day in which the work is performed, independent of the number of hours worked. Under the terms of the Act, the premium portion of the clock overtime payment not only is not part of the "regular rate," *id.*, but also is creditable toward the required overtime compensation. 29 U.S.C. § 207(h).

*Id. at 12.*

Here, the spread time premium satisfies all of the requirements of section 207(e)(7). First, it is paid pursuant to an applicable CBA. Second, it is paid solely on the basis of the time of day in which work is performed, independent of the number of hours worked. The CBA establishes that any work performed more than 10 hours after a driver first performs work on a given workday qualifies for payment of the premium, without respect to the total number of hours the employee has worked that day.[15] Third, at all relevant times, the spread time premium has been at least 1.5 times the employee's non-overtime rate. (*See Stipulations, Ex. AA to Monrad 5-19-11 Dec.*, which explain that prior to the most recent contract revisions (November 2010), this premium ranged from 1.5 times the non-overtime rate to as much as 3 times the non-overtime rate; now the premium ranges from 1.5 times to 2 times the non-overtime rate.) Therefore, spread time premiums should be credited toward any overtime compensation otherwise payable to any of the plaintiffs.

### 3. The District Is Entitled To Credit *All* Applicable Premium Payments Made To Any Plaintiff Against Overtime Compensation That Would Otherwise Be Due To That Plaintiff, And Should Not Be Limited To Applying The Credit Only To Overtime Compensation Due For The Workweek In Which The Premium Was Paid

There is no governing regulation on the issue of *how* the applicable credits are to be credited, and courts are split on that issue. *See e.g. Abbey v. City of Jackson, 883 F.Supp. 181 (E.D. Mich. 1995)* ["Plaintiffs argue that an employer must use credit only in the same work period it incurs a deficiency. Defendant contends that an employer may use accumulated credit to offset all deficiencies . . .No Department of Labor regulations address the present question as it relates to

[15] The deposition testimony of named plaintiff Raymond Robbins illustrates how an employee can receive "spread time" premiums without ever working more than 8 hours driving a bus. Robbins explained that because he is a union steward, his driving was limited to a total of 4 hours day beginning in January 2006. ***Ex. 26** (R. Robbins) pp. 113:17-22; 114:7-11.* Nonetheless, because he worked his 4 hours by way of a split shift (a two-hour run in the early morning, and a separate two-hour run in the evening), his workday ended more than 10 hours after it began and he was thus entitled to the spread time premium. *Id. at 55:2-24 & 114:7-11.* In Robbins' case, the spread time premium resulted in his regularly being paid an amount equal to more than 50 straight time hours per week for only approximately 20 hours of driving. *Id. at 119:9-10, 123:12-19.*

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

credits for excess hours worked in a work period."] Several opinions take the position that credits may offset *all* liability. *Alexander v. United States, 32 F.3d 1571, 1577 (Fed. Cir. 1994)* [premium pay "is creditable toward *any* overtime compensation due under the FLSA"] emphasis added; *Kollheim v. Glynn County, 915 F.2d 1473, 1481 (11th Cir. 1990)* ["the county should be allowed to set-off *all* previously paid overtime premiums ... against overtime found to be due and owing during the damages phase of the trial"]; *Singer v. City of Waco, 324 F.3d 813, 8288 (5th Cir. 2003), cert. denied, 540 U.S. 1177, 158 L. Ed. 2d 77, 124 S. Ct. 1410 (2004)* [characterizing creditable premium payments as pre-payments of subsequently due overtime obligations]; *Hesseltine v. Goodyear Tire & Rubber Co., 391 F.Supp.2d 509 (E.D. Tex. 2005)* ["to the extent they are not *de minimis*, Plaintiffs' claims for overtime compensation under the FLSA are offset in their entirety by prior premium payments made by Goodyear."] Cases that reach a different conclusion, and hold that credits can only be applied to overtime payments due for the workweek in which the credits were paid include *Herman v. Fabri-Centers of Am., Inc., 308 F.3d 580, 590 (6th Cir. 2002), cert. denied, 537 U.S. 1245, 155 L. Ed. 2d 219, 123 S. Ct. 1353 (2003)* [finding that the legislative history, administrative regulations, and applicable case law support imposition of the workweek restriction] and *Howard v. City of Springfield, 274 F.3d 1141, 1148 (7th Cir. 2001)* [asserting that limiting employer offsets under the workweek restriction was necessary to accomplish the purpose of the FLSA]. However, as the court explained in *Abbey*, *supra*, 883 F.Supp. at 187, applying a workweek restriction to the available credits would mean that "plaintiffs would receive a windfall and the purposes and goals of the statute would not be served." There is no Ninth Circuit decision addressing this issue, but in the recent case of *Murillo v. P.G.&E.*, 2010 U.S. Dist. LEXIS 7 3427 (E.D. Cal. 2010), the court noted that the defendant's position that credits should be applied "over the entire period of the lawsuit, rather than during each individual pay period" is "a view which is shared by the majority of courts. *See, e.g., Farris v. County of Riverside, 667 F. Supp. 2d 1151, 1164-65 (C.D. Cal. 2009)*." And in the recent decision in *Farris*, the court cited *Kollheim*, *supra*, with approval. Accordingly, this Court should follow the weight of authority holding that premiums paid can be credited against any overtime compensation due, and not just overtime due for the same workweek

in which the premium was paid.

**D. Premiums For Spread Time Or Elapsed Time Are Not Properly Includable In The Calculation Of The Regular Rate For The Purposes Of Determining The Amount Of Overtime, If Any, To Which Any Plaintiff May Be Entitled**

For the same reasons that the premiums paid for spread time (and all other premiums discussed above in section B) are creditable against overtime payments otherwise due, those premium payments are not to be included in the calculation of the regular rate. *See 29 U.S.C. § 207(e).* Therefore, the Court should rule as a matter of law that the regular rate calculation cannot include these premium payments.

**E. Pursuant To The Terms Of The April 10, 2007, Settlement Agreement, The Plaintiffs Are Barred From Recovering For Any Amounts Allegedly Due For Travel Time For Any Period Prior To August 8, 2006**

An August 2004 class action alleged that the District violated the collective bargaining agreement and state and federal law (including the FLSA) by the manner in which it paid for various activities, including travel time. *See Exs. L & S (in first "WHEREAS" paragraph) to Monrad 5-19-11 Dec.* That lawsuit was settled by way of two separate settlement agreements – the first settlement was reached in December 2004 (*Exhibit N to Monrad 5-19-11 Dec.*) and the second was reached in April 2007 (*Exhibit S to Monrad 5-19-11 Dec.*) Between the time of the first and second settlement agreements in that litigation, there was an intervening Arbitrator's Award dated August 7, 2006. *Ex. R to Monrad 5-19-11 Dec.*

Among other things, the April 2007 settlement agreement recites that "the Parties have met and conferred regarding implementation of this Arbitration Award, and also Plaintiffs' remaining statutory claims relating to travel time, and have agreed to address implementation of the Arbitration Award and Plaintiffs' remaining statutory claims in one integrated Settlement Agreement, the terms of which are set forth below." *Ex. S to Monrad 5-19-11 Dec., at p. 2, last "WHEREAS" paragraph.* To that end, paragraph 2 of the April 10, 2007, settlement agreement provides:

> This Settlement compromises and releases any and all claims arising from Plaintiffs' allegation that the District failed to pay travel time to bus drivers who drive regular scheduled runs which result in different starting and ending points, ***including different portions of split runs***, in settlement of Plaintiffs' FLSA and IWC Wage Order 9 claims regarding such travel time, for the period from September 1, 2001 through and including (but not beyond) August 7, 2006.

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

*Ex. S to Monrad 5-19-11 Dec. at ¶ 2, emphasis added.* Thus, while the agreement does not bar any claims for the period after August 7, 2006, its terms unquestionably preclude plaintiffs from recovering in this action for any overtime allegedly due as a result of travel time for any period up to and including August 7, 2006.

**F. Plaintiffs Are Not Permitted To Recover For Their Gap Time**

The FLSA allows for recovery of unpaid overtime and unpaid minimum wages, but it does not provide for recovery of allegedly unpaid or underpaid straight time wages (below 40 hours) as long as employees are compensated above the applicable minimum wage for all hours worked. As the court explained in *Farris v. City of Riverside*, 667 F.Supp.2d at 1161, the majority of courts that have considered such "gap time" claims have held that they are not available under the FLSA. The *Farris* court further explained:

> 'The Ninth Circuit has not addressed the issue of whether a gap time claim may be asserted under the FLSA, as distinguished from whatever proceedings may be available for breach of contract or under the collective bargaining agreement.' *Maciel v. City of L.A., 569 F. Supp. 2d 1038, 1055 (C.D. Cal. 2008)*. But in declining to address the issue, the Ninth Circuit recognized that "[i]t is not clear that a gap time claim may be asserted under the FLSA, as distinguished from whatever proceedings may be available for breach of contract or under the collective bargaining agreement." *Adair [v. City of Kirkland], 185 F.2d at 1062-63 (9th Cir. 1999)*. And district courts in the Ninth Circuit have agreed with the majority position that the FLSA does not provide for gap time claims. *Maciel, 569 F. Supp. 2d at 1055*; *Abbe [v. City of San Diego], 2007 U.S. Dist. Lexis 87501, 2007 WL 4146696, at *14.*

*Farris at 1161.*

Here, plaintiffs have only pled claims for unpaid overtime to which they claim to be entitled under the FLSA as a result of the agreement by the District and the plaintiffs' union not to count travel time as "hours worked." *Complaint*. The plaintiffs have not even pleaded a claim for unpaid or underpaid straight time, but their damages expert has included such calculations in his estimate of each plaintiff's alleged damages and have thus overestimated damages. *See Ex. 2 to Breshears Dec. (2nd Supp. Report of Regan).* The court should rule as a matter of law that no plaintiff can recover in this action for allegedly unpaid or underpaid straight time hours.

**G. The District Is Entitled To Judgment As A Matter Of Law On All *De Minimis* Claims**

"As a general rule . . . employees cannot recover for otherwise compensable time if it is *de minimis.*" *Lindow v. United States, 738 F.2d 1057, 1061-62 (9th Cir. 1984); see also Alvarez v. IBP,*

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

*Inc., 339 F.3d 894, 903-04 (9th Cir. 2003).* "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours[,] such trifles may be disregarded[, for] split-second absurdities are not justified by the actualities or working conditions or by the policy of the [FLSA]." *Anderson v. Mt. Clemens Pottery Co., supra, 328 US. 680, 692 (1946).*

"Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Lindow, 738 F.2d at 1062*; *see also, Green v. Planters Nut & Chocolate Co., 177 F.2d 187, 188 (4th Cir. 1949)* [finding 10 minutes to be *de minimis*]. While the daily time involved in an activity is the chief concern in determining whether it is *de minimis*, courts also consider "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow, 738 F.2d at 1063.*

Here, the plaintiffs' expert has made no effort whatsoever to account for *de minimis* amounts of overtime resulting from counting start-end and split-shift travel time as "hours worked." The manner in which plaintiffs have been permitted to proceed in this action has deprived the District of an adequate opportunity to demonstrate the extent to which each plaintiff is basing his or her claim on amounts of time that are *de minimis* as a matter of law. Therefore, since 10 minutes is the standard threshold for a determination that such claimed time is *de minimis*, the Court should order as a matter of law that no plaintiff can recover for overtime compensation allegedly due of less than 10 minutes per day.

## IV. CONCLUSION

For all of the foregoing reasons, the District respectfully requests that this Court issue an order (1) decertifying the conditional collective action, (2) denying plaintiffs' motion for partial summary judgment, and (3) summarily adjudicating in favor of the District all of the issues addressed herein.

Dated: June 2, 2011

FOSTER EMPLOYMENT LAW

MICHAEL W. FOSTER
MICHAEL E. WILBUR
TAMMY A. BROWN
Attorneys for Defendant

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610